NO. CIV-21-00011-F

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

### GABRIELLE K. PASQUALETTI,

**Plaintiff,**

**v.**

### SHERIFF TOMMIE JOHNSON, III, et al

**Defendants,**

## MOTION FOR SUMMARY JUDGMENT BY DEFENDANT SHERIFF TOMMIE JOHNSON, III, IN HIS OFFICIAL CAPACITY AND BRIEF IN SUPPORT

Respectfully Submitted,

**VICKI ZEMP BEHENNA**
**DISTRICT ATTORNEY**

*/s/ Carri A. Remillard*
**Carri A. Remillard (OBA 21539)**
**Rodney J. Heggy (OBA 4049)**
**Assistant District Attorneys**
**211 N Robinson Ave, 700 N**
**Oklahoma City, OK  73102**
**Telephone: (405) 713-1600**
**Facsimile: (405) 713-1749**
**rod.heggy@oklahomacounty.org**
**carri.remillard@oklahomacounty.org**
**ATTORNEYS FOR DEFENDANT**
**OKLAHOMA COUNTY**

## **TABLE OF CONTENTS**

**STATEMENT OF UNDISPUTED MATERIAL FACTS**. . . . 2

**ARGUMENT AND AUTHORITIES** . . . . . . 12

**PROPOSITION I:**
STANDARD OF REVIEW . . . . . . 12

**PROPOSITION II:**
GONZALEZ'S CONSTITUTIONAL RIGHTS WERE NOT VIOLATED. 13

   A. THERE IS NO EVIDENCE THAT GONZALEZ HAD AN OBJECTIVELY
     SERIOUS MEDICAL NEED. . . . . . . 14

   B. THERE IS NO EVIDENCE THAT ANYONE HAD KNOWLEDGE THAT
     GONZALEZ WAS SUICIDAL. . . . . . 17

**PROPOSITION III:**
THERE IS NO EVIDENCE THAT A CUSTOM OR POLICY CAUSED
GONZALEZ'S DEATH. . . . . . . 21

   A. CLASSIFICATIONS AND HOUSING ASSIGNMENT. . . . 22

   B. SUICIDE RISK ASSESSMENT AND SIGHT CHECKS. . . . 24

   C. JAIL CELLS AND BED DESIGN FLAWS. . . . . 26

   D. TRAINING AND SUPERVISION. . . . . . 28

   E. FUNDING. . . . . . . . . 28

**CONCLUSION** . . . . . . . 30

**CERTIFICATE OF SERVICE** . . . . . . 31

# TABLE OF AUTHORITIES

## Case Law

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986). . . . . . . . . 12, 13

*Bame v. Iron Cnty.*, 566 F. App'x 731, 740 (10th Cir. 2014) . . . . . 27

*Burgaz ex. rel. Zommer v. Bd of Cnty Comm'rs of Jefferson County, Colo.*,
    30 F4th 1181 (10th Cir. 2022). . . . . . . . 14, 18, 25

*Campbell v. Riahi*,
    No. 1:20-CV-678, 2023 WL 5979211, *4 (S.D. Ohio. Sept. 13, 2023). . 15, 16

*Canton v. Harris*,
    489 U.S. 378 (1989). . . . . . . . . . 27

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) . . . . . . . . . 12

*Carney v. City & Cnty. of Denver*,
    534 F.3d 1269 (10th Cir. 2008). . . . . . . . 13

*City of Revere v. Mass. General Hosp*,
    463 U.S. 239 (1983). . . . . . . . . 28, 29

*Cox v. Glanz*,
    800 F.3d 1231 (10th Cir. 2015) . . . . . . . 15

*Craddock v. Cnty. of Macomb*,
    No. 21-CV-12827, 2024 WL 775172, at *10 (E.D. Mich. Feb. 26, 2024).   14, 15, 16

*Daniels v. Glase*,
    198 F.3d 247 (10th Cir. 1999). . . . . . . . .14

*Estelle v. Gamble*,
    429 U.S. 97 (1976) . . . . . . . . . 13, 14

*Farmer v. Brennan*,
    511 U.S. 825 (1994) . . . . . . . . 13, 14, 26

*Gray v. City of Detroit*,
    399 F.3d 612 (6th Cir. 2005). . . . . . . . 15

*George ex. rel. Bradshaw v. Beaver Cnty,*
    32 F.4th 1246 (10th Cir. 2022).   .   .   .   .   .   13, 15, 18, 25

*Henderson v Secretary of Corrections*,
    518 F2d 694 (10th Cir. 1975).   .   .   .   .   .   .   13

*Hocker v. Walsh*,
    22 F.3d 995 (10th Cir. 1994). .   .   .   .   .   .   .   18

*Hunt v Uphoff*,
    199 F3d 1220 (10th Cir. 1999).   .   .   .   .   .   .   14

*Klein v. Zavaras,*
    80 F.3d 432 (10th Cir. 1996). .   .   .   .   .   .   .   27

*Lawler v. Hardeman Cty. Tenn.,*
    93 F.4th 919 (6th Cir. 2023). .   .   .   .   .   .   .   15

*Mata v. Saiz,*
    427 F.3d 745 (10th Cir. 2005).   .   .   .   .   .   .   18

*Matsuushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986). .   .   .   .   .   .   .   .   13

*Oxendine v Kaplan*,
    241 F3d 1272, 1276 (10th Cir. 2001   .   .   .   .   14

*Riddle v. Mondragon*,
    83 F.3d 1197 (10th Cir. 1996)   .   .   .   .   .   .   13

*Rodgriuez v. Cache County Corp.,*
    2022 WL 2764200 (10th Cir. July 15, 2022).   .   .   .   19

*Sandin v. Conner*,
    515 U.S. 472 (1995). .   .   .   .   .   .   .   .   29

*Simon v. Van Beek,*
    2023 WL 8544800 * 2 (10th Cir. Dec. 11, 2023).   .   .   19
.

*Strain v. Regalado*,
    977 F.3d 984 (10th Cir. 2020)   .   .   .   .   .   .   14

*Taylor v. Barkes*,
    575 U.S. 822 (2015) .   .   .   .   .   .   .   .   15,16

*Vallina v. Cnty. of Teller Sheriff's Off.,*
    757 F. App'x 643 (10th Cir. 2018).   .   .   .   .   .   18

iii

*Vega v. Davis,*
   572 F. App'x. 611 (10th Cir. 2014).    .     .     .     .     .     .     18

*Wilson v. Seiter*,
   501 U.S. 294 (1991) .     .     .     .     .     .     .     26

## Constitutional and Statutory Provisions and Rules

Fed. R. Civ. P. 56     .     .     .     .     .     .     .     .     12

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| GABRIELLE K. PASQUALETTI, as | ) | |
| Special Administrator for the | ) | |
| ESTATE OF KYSTEN MISCHELLE | ) | |
| GONZALEZ, deceased, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIV-21-00011-F |
| | ) | |
| SHERIFF TOMMIE JOHNSON, III, | ) | |
| in his official capacity; P.D. TAYLOR | ) | |
| individually; and TURN KEY HEALTH | ) | |
| CLINICS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**MOTION FOR SUMMARY JUDGMENT BY
<u>DEFENDANT SHERIFF TOMMIE JOHNSON, III</u>**

*"Sometimes the greatest conflicts are not visible to the naked eye, but rather are hidden deep within a person's heart.[1]*

On January 8, 2019, Krysten Gonzalez ("Gonzalez") took her life while incarcerated at the Oklahoma County Detention Center ("OCDC"). While Gonzalez's death is tragic, her suicide does not demonstrate a constitutional violation. To the contrary, the undisputed evidence shows that Gonzalez was screened by a nurse as part of the booking process and was specifically asked whether she was taking medications for depression, psychosis, or other mental health condition; whether she had any suicidal thoughts; whether she attempted suicide in the last past year; and whether she felt hopeless or depressed. Gonzalez denied each.  In fact, during the eighty-nine (89) days, she continued to deny suicidal

---

[1] Author unknown.

thoughts, and nothing occurred to alert detention officers, mental health staff, or medical staff that she was suicidal or that she would commit suicide. Finally, there is <u>no</u> evidence that any policy or custom of the Oklahoma County Sheriff was the moving force behind, caused, or enabled Gonzalez's suicide. Therefore, as demonstrated below, Oklahoma County Sheriff Tommie Johnson III, in his official capacity, is entitled to judgment as a matter of law.

## **STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.      During the early morning hours of October 11, 2018, Oklahoma City Police Officer David Foley observed Gonzalez sitting on the curb outside of the CVS Pharmacy located at SE 44th and S. Shields Blvd.  [Ex. 1, OCPD Records, at OCSO-00026].

2.      Officer Foley discovered that Gonzalez had two outstanding felony warrants – one in Oklahoma County (CF-2017-4065) for failing to appear on a drug possession charge, and the second in Tulsa County (CM-2018-104) for failing to appear on charges involving obstruction of an officer and possession of drug paraphernalia. [Ex. 1, at OCSO -00028 to 00031].

3.      Gonzalez was arrested and booked into the OCDC on October 11, 2018, at approximately 3:06 a.m. [Ex. 1, at OCSO-00033].

4.      This was the nineth time Gonzalez was booked into custody at the OCDC. [Ex. 2, Booking Sheets].

5.      Gonzalez underwent an initial medical and mental health screening on October 11, 2018, at 6:34 a.m., which was conducted by Turn Key Nurse Rebecca Cargill, LPN. [Ex. 3- Med. Rec. at OCSO-373 to 374].

6.      Nurse Cargill asked Gonzalez a series of questions concerning her physical and mental health.  In response to the questions concerning her mental health, Gonzalez **denied**:

- Taking medications for depression, psychosis or any other mental health condition;

- Having suicidal thoughts or ideations;

- Feeling hopeless, depressed, or having a lost of interest in things that once brought her joy;

- Suicide attempts within the last year; and

- Hospitalizations for depression or mental health problems in the past seven years; [Ex. 3, at OCSO-373].

7.      Nurse Cargill documented that Gonzalez had no mental health symptoms and recommended that Gonzalez be housed in general population. [Ex. 3, at OCSO-374].

8.      The information obtained during the booking process is used to determine the person's custody level, housing assignment, and other needs, such as medical/mental health. [Ex. 4, Jeff Carter's Expert Report, at ¶45].

9.      The Oklahoma County Sheriff had established procedures for the management of potentially suicidal inmates.    [Ex. 21, Suicide Prevention/Suicide Precautions Policy].

10.      Relying on the medical judgment of Turn Key's medical and mental health staff, the Sheriff's Office would then determine a security level and housing assignment for each inmate that preserves facility security and meets the needs of inmates.  [Ex. 5,

Gene Bradley Dep. at 9:18 to 10:21; Ex. 6, OCSO Classification Policy; Ex. 7, OCSO Housing Plan Policy].

11.     Inmates were classified based upon an objective system that was based on facility security, inmate programs, inmate supervision needs, and appropriate housing assignments. [Ex. 5, Bradley Dep. at 9:18 to 10:8; Ex. 6, OCSO Classification].

12.     Inmates were assessed and classified at the time of intake but reclassified when there was a change in circumstances. [Ex. 6, Classification Policy].

13.     Inmates are housed in a way that promotes humane treatment and safety to both inmates and OCDC staff. [Ex. 7, Housing Plan Policy].

14.     Based upon Nurse Cargill's recommendation, a classification officer assigned Gonzalez to 6 David, where she remained for her entire eighty-nine days of incarceration. [Ex. 8, Cell Assignment].

**<u>October 2018 Interactions with Medical and Mental Health Staff</u>**

15.     Between October 13 and October 15, 2018, Gonzalez underwent a drug and alcohol withdrawal assessment in the morning and evenings.  [Ex. 3, Med. Rec. at OCSO-362 to 369].

16.     Gonzalez repeatedly denied having suicidal thoughts. [*Id.* at 363, 365, 367, & 369].

17.     On October 16, 2018, Gonzalez underwent a routine mental health evaluation, which was performed by a licensed professional counselor, Jeanetta Loudermilk. [Ex. 3, at OCSO-361].

18.     During this evaluation, LPC Loudermilk documented that Gonzalez self-reported a diagnosis of anxiety, depression, and PTSD, and that in the past, she was prescribed: Prozac 100 mg (antidepressant); Buspar (anxiolytic) dosage unknown; Trazodone (for insomnia) 150 mg; and Neurontin (for seizures and nerve pain) 500 mg 3 x daily, although LPC Loudermilk noted that prescriptions were unconfirmed.  *Id.*  For a sixth time, Gonzalez did not report any suicidal thoughts or demonstrate suicidal behavior. *Id.*

19.     The following day, on October 17, 2018, Jacob Strohl, M.D., a resident in psychiatry at OU Health Science Center, conducted a psychiatric evaluation of Gonzalez. [Ex. 3, at OCSO-358 to 360]; Ex. 9- Strohl Dep.at 7:3-7]. For the seventh time, Gonzalez **denied having suicidal ideation.**  [Ex. 3, at OSCO 359].  Dr. Strohl noted that Gonzalez's current symptoms had no significant impact on her ability to function satisfactorily in her current setting. *Id*.

20.     Dr. Strohl could have recommended that Gonzalez be placed on suicide precautions, if she had demonstrated suicidal behavior. [Ex. 9, Strohl Dep. at 26:8-16].

21.     Dr. Strohl prescribed Gonzalez on Fluoxetine (the generic form of Prozac), Buspirone, and Terazosin. [Ex. 3, at OCSO- 360; Ex. 9, at 15:22-16:3].

22.     Dr. Strohl discussed his plan of treatment with the attending physician, Dr. Gabrial Cuka. [Ex. 3, at OSCO 360; Ex. 9, at 25:7-10].

23.     Dr. Strohl scheduled a thirty-day follow-up appointment and Gonzalez agreed that she would notify security/medical if she experienced any suicidal ideation. [Ex. 3, at OSCO 360].

24.     On October 18, 2018, Gonzalez was evaluated by Carri Matthies, RN, for a headache from hitting her head. [Ex. 3, at OSCO 356 -357]. Gonzalez reported having a history of seizures and migraines. *Id.* Gonzalez was prescribed Acetaminophen for seven days and did not report any suicidal thoughts or ideation or exhibit suicidal behavior. *Id.*

25.     The following day, on October 19th, Nurse Practitioner James Constanzer evaluated Gonzalez because she reported a history of seizures to Nurse Matthies on the previous day. [Ex. 3, at OCSO-263].  Gonzalez was prescribed Trileptal (Oxcarbazepine) for the seizures. [Ex. 10-Medication Recs. at DX1.0177, & 254]. For the nineth time, Gonzalez did not report thoughts of self-harm or exhibit suicidal behavior. [Ex. 3, at OCSO-263].

26.     The following week, on October 25, 2018, Gonzalez complained of shoulder pain, which she believed was related to the seizures, and was evaluated by Tadasha Morris, LPN. [Ex. 3, at OSCO 354-355]. Gonzalez was prescribed 200 mg of Ibuprofen, twice a day, for seven days. [*Id.* at OSCO 354]. Once again, Gonzalez did not report thoughts of self-harm or exhibit suicidal behavior. [*Id.* OSCO 354-355].

27.     Two days later, on October 27, 2018, Gonzalez complained of neck, back pain, and left arm pain. [Ex. 3, at OSCO 350-351].  Nurse Carri Matthies evaluated her and found that she had normal gait, was able to move all extremities, was able to bend side to side, and touch her toes. *Id.* Gonzalez was prescribed Acetaminophen. *Id.* For the eleventh time, Gonzalez did not report thoughts of self-harm or demonstrate suicidal behavior during this visit. *Id.*

28.     On October 29, 2018, Gonzalez underwent a complete history and physical examination conducted by Toni Woods, RN. [Ex. 3, at OSCO 346-349]. In response to the question concerning thoughts of self-harm, Gonzalez stated "**No.**" [*Id.* at 347] Nurse Woods documented that Gonzalez's mental status and orientation was ***unremarkable***. *Id.*

29.     The next day, on October 30th, Gonzalez complained of pain in her left upper mouth from multiple decaying teeth. [Ex. 3, at OCSO 342-343]. Because Gonzalez was currently taking Ibuprofen, no additional medication was ordered. [*Id.* at 342] Again like the previous twelve times, she never reported suicidal thoughts or ideation or demonstrated suicidal behavior. *Id.*

## November 2018 Interactions with Medical and Mental Health Staff

30.     On the morning of November 5, 2018, Gonzalez was seen by Dr. Tanner Hays, a dentist, and Gonzalez informed Dr. Hays that she "would like to save her remaining teeth, if possible, hopefully getting out soon." [Ex. 12, Dental Notes, at DX1.0248-49].

31.     At approximately 2:22 p.m., on that same day, Gonzalez was evaluated by a mental health professional, Samantha Valencia, LMSW. [Ex. 3, at OSCO 340]. Gonzalez denied having any mental health needs and was educated on how to request mental health services if needed. *Id.*

32.     Later that afternoon, Gonzalez was evaluated by Nurse Morris for an upset stomach. [Ex. 3, at OSCO 338-339]. For the fifteenth time, she never reported suicidal thoughts of ideation or demonstrated suicidal behavior. *Id.*

33.     The following week, on November 17, 2018, Gonzalez was seen for a routine mental health visit by Licensed Professional Counselor Michael Hanes. [Ex. 3, at OSCO

337]. LPC Hanes noted that Gonzalez presented as a reliable historian and that she had no presenting mental health symptoms. *Id.* Gonzalez specifically denied the intent to harm herself or having suicidal thoughts. *Id.*

34.    A few hours later, Gonzalez was evaluated by Tadasha Morris, LPN, complaining of pain from decaying teeth. [Ex. 3, at OSCO 335-336]. This time the location was on the bottom of her mouth. *Id.*  Gonzalez was prescribed Ibuprofen. *Id.*

35.    On November 19, 2018, Gonzalez was evaluated by Dr. Hays, who recommended extracting multiple decaying teeth. [Ex. 12, at, DX1.0249].  Gonzalez was unwilling to agree to the course of treatment, and instead requested antibiotics to treat the infection, which Dr. Hays prescribed. *Id.*

36.    On November 20th, Gabriel Cuka, M.D., a board-certified psychiatrist, evaluated Gonzalez for medication management. [Ex. 3, at OSCO 330-332].  During her initial mental health evaluation with LPC Laudermilk, she reported taking Prozac. *See* Fact No. 17.  However, Gonzalez asked Dr. Cuka to prescribe her something else and reported to him that her prior suicide attempts occurred when she was taking Prozac. [*Id.* at 330]. Gonzalez denied having suicidal thoughts or plans to harm herself, and Dr. Cuka documented that Gonzalez's behavior was cooperative and calm and further noted that her mood was euthymic/pleasant. [*Id.* at 330-331], Dr. Cuka discontinued Prozac and added Lexapro. [*Id.* at 332].

37.    Nine days later, on the 29th, Gonzalez broke her right upper molar and was evaluated.  She did not report any suicidal thoughts or demonstrate suicidal behavior. [Ex. 3, at OSCO 328-329].

**December 2018 Interactions with Medical and Mental Health Staff**

38.     On December 2nd, Gonzalez reported swelling under her left eye and a small amount of irritation. Nurse Shirley Hadden notified Dr. King, and he prescribed Zyrtec and Benadryl. [Ex. 3, at OSCO 270 & 327].

39.     On December 7, 2018, Gonzalez was treated again for dental pain and swelling.  She did not report any suicidal thoughts or demonstrate suicidal behavior. [Ex. 3, at OSCO 325-326].

40.     On December 10, 2018, Gonzalez was evaluated by Dr. Hays for treatment of the upper right broken molar. [Ex. 12, at DX1.0249].  Dr. Hays recommended extraction, but Gonzalez declined. *Id.*  Instead, Dr. Hays prescribed her Amoxicillin for seven days. *Id.*

41.     The following day, on December 11th, Samantha Valencia, MSW, evaluated Gonzalez and Gonzalez asked about adjusting the dosage of Lexapro and changing Busar to Zyrexa. [Ex. 3, at OSCO 324]. Ms. Valencia notified the psychiatrist team, and the following day, Dr. Strohl responded that her medication was recently changed on November 20, 2018, and it was too early to evaluate for efficacy.  [Ex. 3, at 304]. Dr. Strohl further noted that Gonzalez's medications should remain the same until her follow-up visit that was scheduled for December 24, 2018. *Id.*

42.     On December 18, 2018, Gonzalez was treated for back pain. [Ex. 3, at 322-323]. Her physical examination was normal. *Id.* Gonzalez requested and was prescribed naproxen for the pain. [*Id.* at 321-323; Ex. 10- MARs, at DX1.257].

43.     On December 24, 2018, Dr. Cuka documented a medication follow-up and noted that there were no medication problems with effectiveness, adverse side effects, or any new problems. [Ex 3, at 303].

44.     On December 29, 2018, Gonzalez submitted a mental health sick call request asking if she could change her anxiety medications. [Ex. 13- Sick Call Req., at DX1.0261]. Nurse Morris created a mental health referral. [Ex. 3, at OSCO 303].

45.     On January 2, 2019, Deborah Chesser, Med, LPC, evaluated Gonzalez, and Gonzalez reported that "Lexapro is making her stomach hurt and [that she] wants to change to something else." [Ex. 3, at OSCO 320].  Ms. Chesser noted that Gonzalez was alert, not in distress, appeared stable, and did not show any overt signs of a mental health concern. *Id.*  Ms. Chesser scheduled an appointment to have psychiatry to follow up with her. [*Id.* at 303].

46.     Due to a scheduling conflict, Dr. Cuka was not able to see her until January 8, 2019. *Id.*

**January 8, 2019—Day of the Suicide**

47.     At approximately 12:56 p.m. on January 8, 2019, Gonzalez and her cellmate, Jessica Nicholson were involved in a physical altercation. Senior Detention Officer Antoinette Adams was notified by Camera-ops of a possible altercation in 6 David, Cell 48.  [Ex. 14, Adams Depo., at 14:16-24]. SDO Adams called for backup and detention staff removed both inmates from Cell 49. [*Id.;* Ex. 15, Adams Rept.].

48.     As SDO Adams escorted Gonzalez to the medical clinic, she asked Gonzalez why she fought with her cellmate Jessica Nicholson, and Gonzalez responded that she just "needed a break." [Ex. 14, Adams Dep., at 15:9-13].

49.     Nurse Sandra Zoski conducted a post use of force assessment on Gonzalez. [Ex. 14, Adams Dep, at 16:4-15; Ex. 15, Adams Rpt.; and Ex. 3 Med. Red., at OSCO 319].

50.     Nurse Zoski examined Gonzalez and observed scratches on the knuckles of her right hand and on the left side of Gonzalez's neck. [Ex. 3 Med. Rec, at OSCO 319.] Gonzalez denied any other injuries. [*Id.*; Ex. 16, Zoski Dep. at 21:5-14, 18-22]. Gonzalez did not appear upset, nor did she display any signs that she was suicidal. [Ex. 16, Zoski Depo., at 24: 11-24; 27:11-19].

51.     SDO Adams escorted Gonzalez back to 6 David, and SDO Adams moved Gonzalez from Cell 49 to Cell 17 to avoid any further altercations between Gonzlez and her cellmate, Jessica Nicholson. [Ex. 14, Adams Dep., at 16:12-15].

52.     Between 1:22 p.m. and 1:49 p.m., pod orderlies are seen on jail video interacting with Gonzalez through the crack of the cell door and Gonzalez can be seen standing at the window of her cell door. [Ex. 4, Carter Rep. at ¶86; Ex. 20, Still Photos from Jail Video, at p. ].

53.     At 2:02 p.m. detention officer Angel Bell conducted a sight check. [Ex. 20, Still Photo, at p. 19].

54.     DO Bell conducted another sight check at 3:18 p.m. *Id.* at p. 23. Bell indicated that she observed Gonzalez sitting on the bottom bunk and that Gonzalez looked

up and made eye contact with her when the Guard-One wand hit the metal cell door. [ Ex. 5, Bradley Dep. 31:16-23].

55.     At 4:07 p.m., DO Adams escorted Nurse Isela Corpus Rivas around 6 David to pass medications to the inmates, and when she arrived at Cell 17, SDO Adams looked into the cell window, but was not able to see Gonzalez because a blanket was hanging over the top of the bunk. [Ex. 14, Adams Dep. at 17:22 to 18:9].  SDO Adams opened the door and asked Gonzalez if she wanted her medication; when Gonzalez did not respond, SDO Adams entered the cell and found Gonzalez dead. [*Id.* at 18:10-17].

## ARGUMENT AND AUTHORITIES

## I.     STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a), a court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. (56(a). The movant bears the initial burden of "show[ing] 'that there is an absence of evidence to support the nonmoving party's case.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). However, once the movant meets this burden, the non-moving party is required to designate specific facts showing that "there are ... genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also Celotex*, 477 U.S. at 324.

Whether a fact is *material* depends on whether it pertains to an element of a claim or a defense, and a dispute is *genuine* if the evidence is so contradictory that a reasonable jury could return a verdict for either party.  *See Anderson,* 477 U.S. at 248. "Where the

record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsuushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (internal quotations omitted). While the Court must view all evidence in the light most favorable to the non-moving party, the Court is not required to make unreasonable inferences in favor of that party. *Carney v. City & Cnty. of Denver,* 534 F.3d 1269, 1276 (10th Cir. 2008).

Applying this legal framework, Sheriff Johnson is entitled to summary judgment because Plaintiff has no evidence of a custom, policy, or practice of Oklahoma County that violated Gonzalez's constitutional rights.

## II.     GONZALEZ'S CONSTITUIONAL RIGHTS WERE NOT VIOLATED.

Jail suicides are analyzed and treated as a claim based on the failure to provide medical care. *See George ex. rel. Bradshaw v. Beaver Cnty,* 32 F.4th 1246, 1255-56 (10th Cir. 2022); *Riddle v. Mondragon,* 83 F.3d 1197, 1202 (10th Cir. 1996) (the duty to provide medical care to inmates includes a duty to provide psychological or psychiatric care).

It is well established that the Constitution does not guarantee a prisoner the type or scope of medical treatment of his choice.  *Henderson v Secretary of Corrections*, 518 F2d 694, 695 (10th Cir. 1975).  Nor is the Constitution offended by claims of mere negligence in diagnosing or providing medical care.  *Estelle v Gamble*, 429 US 97, 105-06 (1976). Rather, to state a claim under Section 1983 for a violation of a prisoner's right to adequate medical care, a plaintiff must demonstrate that the defendant was deliberately indifferent to her serious medical needs.  *Estelle*, 429 US at 104.  "Deliberate indifference" is defined as knowing and disregarding an excessive risk to an inmate's health or safety.  *Farmer v*

*Brennan*, 511 U.S. 825, 827 (1994). In other words, a plaintiff must allege that an official acted (or failed to act) in an objectively unreasonable manner and with subjective awareness of the risk." *Strain v Regaldo*, 977 F3d 984 (10th Cir. 2020), *cert. den*. 142 S.Ct. 312 (2021) (ND Okla.). Significantly, deliberate indifference is a stringent standard that "requires proof that a municipal actor disregarded a known or obvious consequences of his action." *See Burgaz ex. rel. Zommer v. Bd of Cnty Comm'rs of Jefferson County, Colo.*, 30 F4th 1181, 1186 (10th Cir. 2022).   In a jail suicide, a jailer will be held liable if he or she is deliberately indifferent to a substantial risk of suicide. *Id.* A substantial risk of suicide is one in which "there is a strong likelihood, rather than a mere possibility that self-inflection of harm would result."   *See Daniels v. Glase,* 198 F.3d 247, at *4 (10th Cir. 1999) (unpublished).

### A.   THERE IS NO EVIDENCE THAT GONZALEZ HAD AN OBJECTIVELY SERIOUS MEDICAL NEED.

To satisfy the objective component of the deliberate indifference inquiry, a plaintiff must establish a sufficiently serious observable medical need.  *Hunt v Uphoff*, 199 F3d 1220, 1224 (10th Cir. 1999); *see also Oxendine v Kaplan*, 241 F3d 1272, 1276 (10th Cir. 2001).  An objectively serious medical need "is one that has been diagnosed by a physician mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Strain v. Regalado*, 977 F.3d 984, 990 (10th Cir. 2020).

In jail suicide cases, federal courts seemingly brush aside the objective component because death is, of course, a serious harm. *See Craddock v. Cnty. of Macomb*, No. 21-CV-

12827, 2024 WL 775172, at *10 (E.D. Mich. Feb. 26, 2024) (citing *Campbell v. Riahi,* No. 1:20-CV-678, 2023 WL 5979211, *4 (S.D. Ohio. Sept. 13, 2023)). However, a completed suicide, without more, is not enough to satisfy the objective component of deliberate indifference standard. *Id.*

Rather, signs of suicidal tendencies or evidence that the inmate posed a strong likelihood of attempting suicide is required for constitutional liability to attach. *Id. Lawler v. Hardeman Cty. Tenn.,* 93 F.4th 919, 928 (6th Cir. 2023).  As aptly stated by the district court in *Campbell,* "[i]t might seem straightforward that if a woman kills herself, she had some sort of 'serious medical need;'" however, the analysis of the objective component "is a bit more nuanced than that." *Id.*  Indeed, as the *Campbell* court highlighted, the deliberate indifference standard requires the Plaintiff to identify facts from which a jury could conclude that Gonzalez had psychological needs that manifested themselves in suicidal tendencies during her incarceration. *Id.*

Identifying the manifested suicidal tendencies is particularly important in jail suicide cases because "suicide is a difficult event to predict and prevent and often occurs without warning." *Craddock,* at *9 (quoting *Gray v. City of Detroit,* 399 F.3d 612, 616 (6th Cir. 2005).  Moreover, while municipalities must take reasonable steps to protect an inmate's safety and bodily integrity, there is no constitutional right for an inmate to receive an adequate screening for suicide or proper implementation of adequate suicide prevention protocols.   *See George,* 32 F.4th, at 1259; *Cox v. Glanz,* 800 F.3d 1231,1250 (10th Cir. 2015) (citing *Taylor v. Barkes,* 575 U.S. 822 (2015)). Even the Court in *Taylor* noted that the majority of the circuit courts which have addressed the issue, have rejected the notion

that the constitutional right to adequate medical care encompassed the right to be screened for suicidal tendencies, much less screened correctly. *Taylor*, 575 U.S. at 826.

In other words, to survive summary judgment, Plaintiff must produce evidence demonstrating that Gonzalez displayed signs of an obvious and strong likelihood that she would commit suicide. *Craddock* at *9-10. This is something she cannot do.

The undisputed facts show that Gonzalez did not manifest any suicidal tendencies between October 11, 2018, and January 8, 2019. Rather, during the eighty-nine days that Gonzalez spent incarcerated, she never reported to any detention staff or medical staff that she was feeling suicidal. In fact, Gonzalez interacted with medical and mental health staff twenty-five times during her incarceration. *See* Facts Nos. 15 -46, 49-50]. Each and every time, she **denied** having suicidal thoughts or ideations, and she never exhibited any behavior suggesting she was suicidal or that she was at risk of committing suicide.

Gonzalez was evaluated by two different psychiatrists, two licensed professional counselors, and a licensed social worker. None of these five mental health professionals found Gonzalez to be at risk of suicide. If two psychiatrists and three other mental health providers did not see any suicidal tendencies, then how could it be so obvious that even a lay person could recognize the risk of suicide? The answer is it was not obvious. Therefore, from a constitutional standpoint, Gonzalez did not have a sufficiently serious medical need at the time of her death and cannot satisfy the objective prong of deliberate indifference. *See Campbell,* 2023 WL 5979211, at *6.

In addition to the lack of objective signs of a suicidal risk, Gonzalez appeared to be making plans for her future. For example, on November 5, 2018, she told Dr. Tanner that

she wanted to save her teeth, if possible, because she was getting out soon. [Ex. 12, Dental Notes, at DX1.0249]. A month later, on December 6, 2018, Gonzalez began writing a letter to her father. In the letter, Gonzalez expressed her desire to reconnect with her father. She asked him to write to her. She also asked him to download the app "Getting Out" so they could set up virtual visits. [ Ex. 17, 12/6/18 Letter].

On December 31, 2018, Gonzalez asked a male friend to place money on her books. Wanting to save her teeth, reconnecting with her father, and asking a friend to send money all demonstrate that Gonzalez was looking towards the future and not contemplating suicide. *See* Jail Expert Rept. Jeff Carter, at ¶¶ 77-78.  Because Gonzalez did not have psychological needs that manifested themselves as a strong likelihood that she would complete suicide, a jury could not find that she suffered from an objectively serious medical condition.  Therefore, the Sheriff is entitled to summary judgment.

### B. THERE IS NO EVIDENCE THAT ANYONE HAD KNOWLEDGE THAT GONZALEZ WAS SUICIDAL.

Plaintiff contends that medical and detention staff were aware of Gonzalez's history of attempting suicide, her prior admission to mental health court, and that she suffered from depression, anxiety, and post-traumatic stress disorder. [Doc. 1, at ¶¶25-26, 37].  However, Plaintiff has not identified any detention staff who were aware of these facts.

A prison official does not act recklessly or with deliberate indifference by failing to act and avert the suicide of a detainee who displays no outward indicators of suicidal ideation, actively denies suicidal ideation, and has been cleared by a psychiatrist, licensed mental health providers, and other medical professionals to be detained in general

population. *Est. of Vallina v. Cnty. of Teller Sheriff's Off.,* 757 F. App'x 643, 647 (10th Cir. 2018*); See generally Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005).

In fact, Officer Adams who was the rover assigned to Gonzalez's pod and found Gonzalez dead in her cell, testified that she was not aware that Gonzalez was ordered to mental health court or was waiting for a bed at an inpatient facility. [Ex. 14, Adams Dep.at 11:25 to 12:4]. Likewise, she did not observe Gonzalez engage in any concerning behavior.

More importantly, a history of prior suicide attempts, suffering from a mental health condition, taking medications and participating in mental health court are insufficient to establish the subjective component of deliberate indifference and do not rise to the level of deliberate indifference under Tenth Circuit precedent. *See Estate of Hocker v. Walsh*, 22 F.3d 995, 1000 (10th Cir. 1994) (holding that the deliberate indifference standard requires defendant to subjectively disregard the ***specific*** risk of suicide and not merely the risk of intoxication); *Vega v. Davis,* 572 F. App'x. 611, 618-19 (10th Cir. 2014) (unpublished) (reversing the denial of a motion to dismiss the deliberate indifference claims where the warden's possible knowledge that plaintiff had a mental illness that was untreated was insufficient to establish the subjective knowledge of a suicide risk).

Notably, over the past few years, the Tenth Circuit has issued four separate opinions involving jail suicides. Two cases at the summary judgment stage and two cases at the motion to dismiss stage. In all four cases, the Court has reiterated the high hurdle a plaintiff must clear to satisfy the subjective component of the deliberate indifference test. *See the Estate of Burgaz v. Bd. of Cnty. Commr. for Jefferson Cnty. Colorado*, 30 F.4th 1181, 1184 (10th Cir. 2022) (affirming the dismissal of entity claims despite allegations the deputies

were aware that the inmate suffered from mental illnesses, drug addiction, had been involuntarily committed to a mental health facility, had a history of suicidal tendencies, and previously attempted suicide at that jail because the allegations were insufficient to infer actual knowledge that would have clued the deputies in to the inmate's imminent and specific danger); *George v. Beaver Cty,* 32 F.4th 1246, 1253 (10th Cir. 2022)(affirming summary judgment for the county even though inmate reported prior thoughts of suicide, threatened to kill himself if placed in a cell, placed on suicide watch but jailers failed to put him in a suicide smock, create a suicide log, which violated the sheriff's suicide policy, and two days later gave him a blanket, sheets, and a pillow case that he used to commit suicide); *Rodgriuez v. Cache County Corp.,* 2022 WL 2764200 (10th Cir. July 15, 2022) (unpublished) (affirming summary judgment for the county finding no knowledge of inmate's risk of suicide and nothing occurred during the two week detention that indicated the inmate was suicidal); *Estate of Nathan Timothy Simon v. Van Beek,* 2023 WL 8544800 * 2 (10th Cir. December 11, 2023) (unpublished) (affirming dismissal on qualified immunity grounds and rejecting the inference that supervisors had actual knowledge of Simon's risk of suicide based upon the fact a referral for a mental health assessment was emailed to the sheriff's office and to the jail).

The facts in the matter *sub judice* are far less remarkable than the facts in *Brugaz, George, Rodriquez, or Simon.* Without question, if the Tenth Circuit found deliberate indifference to be lacking in those cases, then if follows a fortiori that deliberate indifference cannot be found here. Indeed, Plaintiff has no evidence that prior to

Gonzalez's suicide on January 8, 2019, that any Sheriff employee was subjectively aware that Gonzalez faced an immediate suicide risk.

In fact, three hours before Gonzalez took her life, Nurse Sandra Zoski examined Gonzalez following the fight with her cell mate. [Ex. 18, Adams Dep. at, 15-16]. Nurse Zoski testified that Gonzalez was not upset and did not display any signs of suicidal behavior, nor did she make any suicidal statements. [ Ex. 16, Zoski Dep. at 16:25 to 17:14; 21:5-14].  She was upbeat and joked round with Nurse Zoski about the fight. Essential to the issue of knowledge, Nurse Zoski was not aware that Gonzalez was taking Lexapro or that she had past suicide attempts. [Ex. 16, Zoski Dep. at 23:25 to 24:10]. Nurse Zoski further testified that even if she had known these things it would not have changed her assessment because Gonzalez did not show any indications that she was suffering from a mental health issue. [*Id.* at 24:10 -16].

Likewise, Officer Adams asked Gonzalez why she fought with her cellmate, and Gonzalez responded that she just needed a break. [Ex. 14, Adams Dep. at 15:9-13].  SDO Adams did not observe anything out of the ordinary with Gonzalez, so she took her to the medical clinic following the fight. [*Id.* at 15:9 to 16:10].

The lack of subjective awareness is bolstered by the fact Gonzalez had over twenty-five encounters with medical and mental health staff, and she repeatedly denied thoughts of harming herself or suicidal ideation.  She interacted with custody staff regularly and never reported thoughts of harming herself. During the eighty-nine days she was confined to the OCDC, Gonzalez never demonstrated any unusual or concerning behavior.

Likewise, Gonzalez made thirty-seven requests to staff for articles of clothing, laundry bag, prayer materials, bedding articles, phone numbers, sandals, and requested to be a jail orderly.  None of these requests suggests Gonzalez was suicidal.  Along the same vein, Gonzalez submitted 12 sick call requests, all of the requests were addressed by medical and mental health, and none of the sick calls mentioned suicidal ideations. There is simply no evidence that anyone was subjectively aware that Gonzalez was suicidal, and without evidence of subjective awareness, Plaintiff cannot demonstrate an underlying constitutional violation.  Therefore, the Sheriff is entitled to summary judgment.

## III.   THERE IS NO EVIDENCE THAT A CUSTOM OR POLICY CAUSED GONZALEZ'S DEATH.

Even assuming *arguendo* that Plaintiff could demonstrate an underlying violation of Gonzalez's constitutional rights, the Sheriff is still entitled to summary judgment because there is no evidence that any policy, practice, or custom of the Sheriff's Office caused a violation of Gonzalez's constitutional rights.

To impose liability against the Sheriff, in his official capacity, under 42 U.S.C. § 1983, Plaintiff must prove the following: (1) a county policy or custom; (2) that caused a constitutional injury; and (3) that the policy or custom was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury.  *Id.*

Relying on the stale report from the Department of Justice and a report from the Vera Institute, Plaintiff maintains that the Sheriff was aware of constitutional deficiencies at the OCDC.  Pointing to faulty policies on classifying inmates with mental health needs,

failing to properly assess a suicide risk, improper sight checks, and cell designs, Plaintiff alleges that the Sheriff failed to protect Gonzalez from herself.

A.    **CLASSIFICATIONS AND HOUSING ASSIGNMENT**.

Plaintiff insists that because Gonzalez had past diagnoses of depression, post-traumatic stress disorder, prior suicide attempts, history of psychiatric hospitalizations, substance abuse, and involved in Mental Health Court, she should have been assigned to the mental health unit and at a minimum designated as "mental health observation status." However, Plaintiff has no evidence that housing Gonzalez in general population was constitutionally improper or that it caused Gonzalez to commit suicide.

First, the Sheriff had booking policies and procedures in place that include both medical and mental health screenings, and the booking policies satisfies the Oklahoma Jail Standards and meets industry standards. *See* Ex. 4, Carter Expert Report, at ¶¶42-51].  With the assistance of Turn Key Health and mental health professionals from OU Medical Center, inmates underwent a medical and mental health screening as part of the booking process.  The policies outlined how inmates were to be screened and evaluated for the potential risk of suicide or other potentially harmful conditions or behaviors. [Ex. 5, Bradley Dep., at 9:18 to 10:21]. Based upon the answers to the intake questions, a nurse would make a recommendation for housing and a classification officer would assign the inmate to a cell. *Id.* at 10:9-21.

Second, at the time Gonzalez was booked into the jail, she underwent a medical and mental health screening. [Ex. 3, at OCSO-370 to 374]. She was asked a series of questions aimed at assessing her suicide risk and whether she was feeling suicidal. *Id.* at OCSO-373,

Questions 2-9, and able to answer the questions coherently (Question 1). Importantly, Gonzales denied currently taking mental health medications (Question 2), feeling suicidal (Questions 4 & 8), having thoughts of harming herself (Question 3), prior suicide attempts (Question 5), and psychiatric hospitalizations (Question 14). *Id.*

Third, Nurse Rebecca Cargill did not observe any signs of prior suicide attempts (Question 6) and did not observe any signs or symptoms of a mental health condition (Question 20 and Plan of Action) *Id.* at OCSO-373 to 374. During the following five days, Gonzalez underwent a series of drug and alcohol withdrawal assessments, a psychiatric evaluation, and mental health assessments. [Ex. 3, at OSCO-358 to 369].  Gonzalez repeatedly denied thoughts or feelings of self-harm and never engaged in concerning behavior or displayed any suicidal symptomology. *Id.*

Fourth, Gonzalez did not have a current mental health need that necessitated more intensive monitoring at any time between October 11, 2018, and January 8, 2019. [Ex. 18, Dr. Bruce Cohen, Exp. Rept., at p. 13]. Having a mental health diagnosis like anxiety, depression or PTSD, or taking psychotropic medications, without more, does not require a higher-level mental health observation.  *Id.* at pp. 12-13. As additional clarity, according to the National Institute of Mental Health, which is the lead federal agency for research on mental health disorders, "[i]t is estimated that more than one in five U.S. adults live with a mental illness (57.8 million in 2021)," and that "the impact of the mental illness can range from no impairment to mild, moderate, and even severe impairment.[2]  Stated another way,

---

[2] https://www.nimh.nih.gov/health/statistics/mental-illness; last visited on June 17. 2024.

suffering from a mental health illness or using prescribed medication is not tantamount to an inability to function without intensive monitoring by mental health professional. [Ex. 5, Bradley Depo. 12:1 to 13:16].

As aptly stated by Dr. Choen, who is a psychiatric expert in correctional settings, housing assignments should be "based on an inmate's **current** mental health needs along with an individualized assessment of their **current** level of risk to themselves or others." (Emphasis added). [Ex. 18, Cohen Rept. at p. 13].  In Gonzalez's case, "she received serial mental health and psychiatric visits, during which there were individualized assessments of her current psychiatric symptoms, her treatment needs, and her housing status.  She did not report suicidal ideation or present with symptoms necessitating more intensive monitoring at any of these assessments." *Id.*   Plaintiff has no psychiatric expert to refute Dr. Cohen's opinions; therefore, she cannot overcome summary judgment.

### B. SUICIDE RISK ASSESSMENTS AND SIGHT CHECKS.

Gonzalez was housed in 6 David, which is a general population pod. Sight checks for general population are required to be conducted hourly. [Ex. 19, OCDC Sight Check Policy].  It is undisputed that hourly sight checks were done.

Following a physical altercation with her cellmate, at approximately 1:20 p.m. on January 8, 2019, Gonzalez was moved from Cell 49 and placed in Cell 17 to avoid any further altercations between Gonzlez and her cellmate, Jessica Nicholson. Between 1:22 p.m. and 1:49 p.m., pod orderlies are seen on jail video interacting with Gonzalez through the crack of the cell door and Gonzalez can be seen standing at the window of her cell door. At 2:02 p.m. detention officer Angel Bell conducted a sight check [Ex. 20, at 19.] At 2:40

p.m. a shadow moves across the window of Gonzalez's cell, which is likely when Gonzalez hung the blanket over the top bunk [*Id.* at 20-21].

DO Bell conducted another sight check at 3:13 p.m. [*Id.* at 23]. Bell indicated that she observed Gonzalez sitting on the bottom bunk with her feet on the floor, slouched over, with her elbows on her thighs. When Bell placed the Guard-One wand against the metal cell door, Gonzalez looked up and made eye contact with Bell. Ex. 5, Bradley Dep. 31:16-23]. At 4:20 p.m., DO Adams opened Gonzalez's cell door when escorting nursing staff with med pass, and found Gonzalez hanging.

Plaintiff avers that the blanket was a red flag that should have raised a concern to detention staff, as well as prompted DO Bell to investigate the reason why Gonzalez hung the blanket. However, there are non-nefarious reasons why Gonzalez hung the blanket. [Ex. 5, Bradley Dep. at 31: 24 to 32:6]. For example, Lt. Bradley testified that some inmates hang blankets to block the light or create privacy. *Id.* Nonetheless, Bell conducted a sight check thirty-eight minutes later, and reported that she observed Gonzalez alive, and that Gonzalez made eye contact with her. [*Id.* 32:8-21]. While Plaintiff's expert is critical of the length of time Bell spent conducting the sight check, showing that Bell should have conducted a more thorough sight check does not establish municipal liability. *See George,* 32 F.4th, at 1524; *Burgaz,* 30 F.4th at 1187-88.

To be sure, the inmate in *Burgaz* used the cords and wires from a mounted television to hang herself in the jail dayroom. *Id.* at 1184. While a deputy was conducting a "walk-through," he walked past the dayroom, where Burgaz was attempting to hang herself. *Id.* The deputy never looked into the dayroom. *Id.* Even more astonishing, the dayroom had

a camera, which the estate argued had "sufficient clarity that any officer monitoring the live feed would immediately recognize Ms. Burgaz was attempting suicide." *Id.* at 1189. On appeal, the Tenth Circuit affirmed the dismissal finding that the "immediate risk of suicide was not obvious," and held that at most, the deputies knew Burgaz was a detainee at a jail who had a history of mental illness, substance abuse, and a previous suicide at the same jail." *Id.*

### C. JAIL CELLS AND BED DESIGN FLAWS.

Plaintiff contends that the Oklahoma County Sheriff was deliberately indifferent to the jail's design flaws and the construction of the jail beds, which Gonzalez used to commit suicide.

First, Plaintiff has no evidence to support her contentions that the conditions—bearing everything in mind—rose to the level of a "substantial" or "sufficiently serious" risk as opposed to some lesser risk of harm. *See Farmer v. Brennan,* 511 U.S. 825, 834 (1994). In a jail setting, a risk of harm to some degree always exists by the nature of its being a jail. *See Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) ("The Constitution, we said, does not mandate comfortable prisons, and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation") (Internal citations and quotations omitted).

Indeed, demonstrating deliberate indifference is a high bar, and the Tenth Circuit has noted that challenges to the physical attributes of a jail may be more properly raised under a state law tort theory of negligent design. *Bame v. Iron Cnty.*, 566 F. App'x 731,

740 (10th Cir. 2014) (reasoning that plaintiff's "argument about the water pipe, the blind spot, and the lack of a surveillance camera all sound remarkably like the tort of negligent design, a state remedy, not a constitutional violation," and granting summary judgment on § 1983 claim related to jail's physical features).

Second, Plaintiff only speculates about how Gonzalez hung herself. Lt. Bradley testified that he could not tell what Gonzalez tied the sheet to, but in any event, the area was not the two areas noted by the DOJ. [Ex. 5, Bradley Dep. at 35:11 to 36:7].

Third, Plaintiff points to "draft consent decree" that Oklahoma County never entered into and postulates that the DOJ required the Sheriff to correct the facility design flaws. [Ex. 5, Bradley Dep. at 37:25 to 38:19].   Not only is Plaintiff wrong in her hypothesis, but the Tenth Circuit has made clear that "[r]emedial decrees do not create or enlarge constitutional rights, or create "rights ... secured by the laws," 42 U.S.C. § 1983, "sufficient to serve as a basis for liability under § 1983." *Klein v. Zavaras,* 80 F.3d 432, 435 (10th Cir. 1996) ("Compliance would be deterred if individual prisoners were allowed to seek damages for violations of every detail of the decree. Accordingly, we decline to hold that a consent decree may be enforced through a Section 1983 action.").

### D.  TRAINING AND SUPERVISION

While failure to properly train and supervise employees may serve as the basis for Section 1983 liability, it may do so only in limited circumstances; in such instances, a plaintiff must show that the municipal action was taken with deliberate indifference as to its known or obvious consequences. *Canton v. Harris*, 489 U.S. 378, 387-88 (1989); *Board of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997).

Here too, Plaintiff has no evidence that any specific training or supervision practices were deficient, or how the failure to provide adequate employment practices contributed to a violation of decedent's rights. Gonzalez concealed her suicidal intentions and made the intentional decision to hang herself in her jail cell. Jail officials cannot be deliberately indifferent to a medical need that is hidden and unknown, and no amount of training would prove otherwise.

The record clearly proves that the Sheriff's detention officers called for medical professional evaluation at every turn. Indeed, Gonzalez received serial mental health and psychiatric visits, and they conducted individualized assessments of her current psychiatric symptoms, her treatment needs, and her housing status. She did not report suicidal ideation or present with symptoms necessitating more intensive monitoring at any of these assessments. As such, the Sheriff is entitled to summary judgment on Plaintiff's training and supervision theory.

### E. FUNDING.

As an initial matter, neither the Tenth Circuit nor the United States Supreme Court has held that insufficient funding may be a basis upon which to impose municipal liability. To the contrary, the Supreme Court has recognized payment for inmate medical care to be a matter of state law in *City of Revere v. Mass. General Hosp*, 463 U.S. 239 (1983). There the Court stated: "[a]s long as the governmental entity ensures that the medical care needed is in fact provided the Constitution does not dictate how the cost of that care should be allocated as between the entity and the provider of the care. That is a matter of state law." *Id.* at 245. ***"[I]n short, the injured detainee's constitutional right is to receive the needed***

*medical treatment; how the City of Revere obtains such treatment is not a federal constitutional question*." *Id*. at 245-46 (emphasis added). To conclude otherwise would place federal courts in the position of managing not only county functions but jail operations as well. After all, every decision made in the operation of a detention center could trace its roots to funding in some way if one is willing to dissect the decision-making process *ad infinitum*.

To allow constitutional liability to rest on attenuated funding decisions with nothing but the amorphous notion that more money can always solve any problem will leave the courts dissecting county budgets and second-guessing policy decisions that impact all levels of the conditions of confinement if not county government as a whole. Such a position is untethered to the proper role of the courts. *See Sandin v. Conner*, 515 U.S. 472, 482-83 (1995)(rejecting notion that federal courts should be involved in the day-to-day management of prisons which is best left to the appropriate deference and expertise of prison officials).

Nonetheless, even if funding was a viable theory for municipal liability, Plaintiff has no evidence to support any funding claim.

## <u>CONCLUSION</u>

Suicide, although certainly tragic, is undeniably an intentional act. Gonzalez deliberately hid her despair, purposefully concealed her life ending plan, and made the intentional decision to hang herself in her jail cell.

During the eighty-nine days Gonzalez spent in jail, she was evaluated by two different psychiatrists, two licensed professional counselors, and a licensed social worker.

None of these five mental health professionals found Gonzalez to be at risk of suicide. Jail officials cannot be deliberately indifferent to a medical need that is hidden or unknown, and they do not act recklessly or with deliberate indifference by failing to act and avert the suicide of a detainee who displayed no outward indicators of suicidal ideation and actively denied suicidal intent at every turn.

Therefore, Judgment should be entered for Sheriff Tommie Johnson, III, in his official capacity.

<div style="margin-left:40%">

Respectfully Submitted,

VICKI ZEMP BEHENNA
DISTRICT ATTORNEY

/s/ *Carri A. Remillard*
Carri A. Remillard (OBA 21539)
Rodney J. Heggy (OBA 4049)
Assistant District Attorneys
211 N Robinson Ave, 700 N
Oklahoma City, OK  73102
Telephone: (405) 713-1600
Facsimile: (405) 713-1749
rod.heggy@oklahomacounty.org
carri.remillard@oklahomacounty.org
ATTORNEYS      FOR      DEFENDANT
OKLAHOMA COUNTY

</div>

## **CERTIFICATE OF SERVICE**

The foregoing was delivered using the ECF System for filing, and based upon the records on file in this case, the Clerk of Court will transmit a Notice of Electronic Filing to the following participants:

Micky Walsh
Derek S. Franseen
mwalsh@walshlawok.com
dfranseen@walshlawok.com

*Attorneys for Plaintiffs*

Allie Al Hoy
Anamayan Narendran
Chance Holland
*Attorneys for Defendant*
*Turn Key Health*

/s/ Carri A. Remillard