IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA


GABRIELLE K. PASQUALETTI, as )
Special Administrator for the)
Estate of KRYSTEN MISCHELLE  )
GONZALEZ, deceased,          )
                             )
            Plaintiff,       )
                             )
vs.                          )CASE NO. CIV-21-0011-F
                             )
SHERIFF TOMMIE JOHNSON, III, )
in his official capacity;    )
P. D. TAYLOR, individually;  )
and TURN KEY HEALTH CLINICS, )
LLC,                         )
                             )
            Defendants.      )


VIDEOTAPED DEPOSITION OF SANDRA JEAN ZOSKI

TAKEN ON BEHALF OF THE PLAINTIFF

ON DECEMBER 7, 2023, BEGINNING AT 9:54 A.M.

IN OKLAHOMA CITY, OKLAHOMA


REPORTED BY:  KERRI L. WOOD, CSR

```
 1                      APPEARANCES

 2   On behalf of the Plaintiff:

 3        DEREK S. FRANSEEN
          Attorney at Law
 4        Walsh & Franseen
          200 East Tenth Street Plaza
 5        Edmond, Oklahoma  73034
          (405)843-7600
 6        dfranseen@walshlawok.com

 7

 8   On behalf of Defendant Sheriff Tommie Johnson, III:

 9        CARRI REMILLARD
          Assistant District Attorney
10        Oklahoma County District Attorney's Office
          211 North Robinson Avenue
11        Suite 700
          Oklahoma City, Oklahoma  73102
12        (405)713-1600
          carri.remillard@oklahomacounty.org
13

14
     On behalf of Defendant Turn Key Health Clinics, LLC:
15
          ANAMAYAN NARENDRAN
16        Attorney at Law
          Hall Booth Smith, P.C.
17        6301 Waterford Boulevard
          Suite 200
18        Oklahoma City, Oklahoma  73118
          (405)513-7111
19        anarendran@hallboothsmith.com

20

21   Videographer:

22        GABE PACK

23

24

25
```

1                          CONTENTS

2                                                        PAGE

3    Exhibits . . . . . . . . . . . . . . . . .   4

4    Stipulations . . . . . . . . . . . . . .   4

5    Direct Examination by Mr. Franseen . . . . . .   5

6    Jurat Page . . . . . . . . . . . . . .  44

7    Correction Sheet . . . . . . . . . . .  45

8    Reporter's Certificate . . . . . . . . . . .  46

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              PLAINTIFF'S EXHIBITS

 2

 3   NO.   DESCRIPTION                      PAGE

 4   1     Post Use of Force Assessment      17

 5   2     Statement                         31

 6   3     Event List Summary Report         40

 7

 8

 9

10

11

12

13

14

15              STIPULATIONS

16        It is stipulated that the videotaped

17   deposition of SANDRA JEAN ZOSKI may be taken on

18   December 7, 2023, pursuant to Notice and Agreement

19   and in accordance with the Federal Rules of Civil

20   Procedure, before Kerri L. Wood, CSR.  It is further

21   stipulated that an objection by counsel for one

22   Defendant is an objection for all Defendants.

23

24

25
```

```
 1                    (9:54 a.m.)

 2              THE VIDEOGRAPHER:  This is the

 3   videotaped deposition of Sandra Zoski in the matter

 4   of Pasqualetti, et al. versus Johnson, et al.  This

 5   deposition's being held at 6301 Waterford Boulevard

 6   in Oklahoma City, Oklahoma, on December 7th, 2023.

 7   We are on the record at 9:54 a.m.

 8         Will counsel please state your appearances

 9   for the record.

10              MR. FRANSEEN:  Derek Franseen on behalf

11   of the Plaintiffs.

12              MR. NARENDRAN:  Anamayan Narendran on

13   behalf of Turn Key.

14              MS. REMILLARD:  Carri Remillard on

15   behalf of Sheriff Tommie Johnson, III.

16              THE VIDEOGRAPHER:  Okay.  The court

17   reporter will now swear in the witness.

18              SANDRA JEAN ZOSKI,

19   being first duly sworn, deposes and says in reply

20   to the questions propounded as follows:

21                   * * * * * *

22              DIRECT EXAMINATION

23   BY MR. FRANSEEN:

24      Q    Would you please state your full name for

25   the record.
```

1      A    Sandra Jean Zoski.

2      Q    And have you ever gone by a different last

3  name while you were practicing as a nurse?

4      A    No.

5      Q    Do you have a -- do you have a maiden name,

6  or have you ever gone by another name?

7      A    Yes.  My name was Sandra Condit, to begin

8  with.  Then I married Zoski.  Then I married

9  Doug Pearson, Gary Deaton, and then back to Zoski.

10      Q    Okay.  I'd ask you to spell those names just

11  so if we look them up, we can have them correct.

12  So, we have Condit.  How do you spell Condit?

13      A    C-o-n-d-i-t.

14      Q    And then Pearson was the next one?

15      A    P-e-a-r-s-o-n.

16      Q    And then Deaton?

17      A    D-e-a-t-o-n.

18      Q    Thank you.

19           And Zoski is Z-o-s-k-i?

20      A    Yes, sir.

21      Q    Can you briefly tell me what led to your

22  journey to become an LPN?

23      A    I had three kids, got a divorce, had to make

24  a living for my kids.  So, I decided I wanted to be

25  a nurse and do that.

1    Q    What year did you start nursing training?

2    A    Two thousand and -- I mean, 1983.

3    Q    And did you start off to become an LPN, or

4    did you go through different levels?

5    A    No.  I worked in a nursing home maybe

6    six months, as a aide.

7    Q    And then you achieved your LPN license?

8    A    Yes, sir.

9    Q    And prior -- or when did you start working

10   for Turn Key medical?

11   A    I think it was 2006, around there.

12   Q    Was that here in Oklahoma?

13   A    Yes, sir.

14   Q    What facility did you start at?

15   A    Cleveland County.

16   Q    Prior to working with Turn Key medical, did

17   you have any other experience in a correctional

18   facility?

19   A    Yes, sir.

20   Q    Where at?

21   A    At LARC, Lexington Assessment and Receiving

22   (sic) Center.

23   Q    And that's a re- --

24   A    In Okla- --

25   Q    -- in -- in Lexington, and it's a

```
 1   DOC center?

 2       A    Yes, sir.

 3       Q    And, for the record, "DOC" is "Department of

 4   Corrections" through --

 5       A    Yes.

 6       Q    -- the State.

 7       A    Yes, sir.

 8       Q    Have you ever been asked by Turn Key to

 9   evaluate their nursing assessments or mental health

10   assessments?

11       A    Yes, sir.

12       Q    When -- when have you been asked to assist

13   with that?

14       A    Well, we do it all the time.  That's part of

15   our job -- is to assess them.

16       Q    Yeah.  And, so, part of one -- one of your

17   job duties is to provide the mental health

18   assessments.

19       A    We do some of them.  If they bring a person

20   in, we assess them if -- if mental health is not

21   there.

22       Q    And, so, the policy is for mental health to

23   provide the assessments if they're there.

24       A    Yes, sir.

25       Q    And if mental health is not there, then an
```

1    LPN or some other nurse provides that assessment?

2        A    Yes, sir.

3        Q    What if an LPN -- is there always an LPN

4    on-site?

5        A    Yes, sir.

6        Q    How often is mental health on-site?

7        A    Monday through Friday.

8        Q    What hours?

9        A    I think it's 8:00 to 4:00, something like

10   that.

11       Q    And are we referring to the same schedule

12   and assignments that would be at Oklahoma County

13   Detention Center?

14       A    Yes, sir.

15       Q    And would those be the same assignments that

16   would have been in effect in 2019?

17       A    Yes, sir.

18       Q    Prior to working at LARC -- or, I guess,

19   while you were at LARC, did you provide any mental

20   health assessments?

21       A    Yes, sir.

22       Q    And can you explain to me what type of

23   assessments you would perform at LARC?

24       A    They would bring them into our clinic.  We

25   have a clinic there.  And we'd -- they bring them

1  in, and we would talk to them if there wasn't a

2  psych person around.  And then we would send them to

3  SP1 which they would take them down to "SHU" -- is

4  what they call it in a prison.

5      Q    And that would be if someone has a -- a

6  mental health complaint?

7      A    If they were suicidal or going to hurt

8  themself or hurt somebody else.

9      Q    What if someone had a past history of

10  suicidal behavior?

11     A    It would be in their chart, and we would

12  kind of go from there by that.

13     Q    When you were at Lexington, did you have any

14  specific floors for mental health patients -- or

15  areas, I believe?

16     A    Not that I remember.  I don't think so.

17     Q    Do you know if there'd been any changes

18  since 2006 as Lexing- -- Lexington related to

19  mental --

20     A    I --

21     Q    -- health?

22     A    -- haven't been back there for a while.

23     Q    Did you receive training, when you became

24  a LPN, in mental health assessments?

25     A    No, sir.

1    Q    Do you know anything in the Oklahoma nursing

2    act that permits an LPN to perform mental health

3    assessments?

4    A    No, sir.

5    Q    And I also want to talk about the

6    differences between an RN and an LPN.  Can you

7    explain to me what those differences are?

8    A    An RN is over the LPNs and everything.

9    They're in charge of the LPNs, and they -- if we

10    have a problem, we go to the RNs with them.  And we

11    do about the same thing except they're charging and

12    stuff like that.

13    Q    When you say "they're charging," what do you

14    mean?

15    A    They're in charge of L- -- LPNs and see that

16    we get our tasks done.  We -- we have tasks, and she

17    sees that we get all of our tasks done.  If we have

18    a question, we go to the RN and ask her about the

19    problem that we have.

20    Q    Kind of a supervisor role?

21    A    Yes.

22    Q    And -- and when you say you go to them when

23    you have a question, are you given autonomy unless

24    you have a question?

25    A    I -- I don't understand the question.

1    Q    Because if you perform a use of force

2    assessment, are you able to perform that entire

3    assessment without checking out to an RN?

4    A    Yes, sir, most of the time.

5    Q    And same with on an initial intake, are you

6    able to perform the entire intake without checking

7    out to an RN?

8    A    Yes, sir.

9    Q    Can you explain to me under the licensing,

10   what the difference is between an LPN and an RN?

11   A    Not exactly.  To me, they've got more

12   education.  Like I say, we do -- we perform about

13   the same duties except she supervises us and stuff.

14   I've taken IV therapy classes.  So, I do IVs and

15   draw blood and stuff like that.  And, like I say, to

16   me, she -- she's just a supervisor.

17   Q    And this was while you're talking -- when

18   you were referring to as -- as a "supervisor,"

19   you're talking about while you were at Turn Key.

20   A    Yes.

21   Q    And you say while at Turn Key, you guys

22   performed the same tasks as an RN?

23   A    Yes, sir.

24   Q    Is that the same in other facilities?

25   A    Yes, sir.

1    Q    Now, why -- why would they have a different

2    set of roles and responsibilities that they're

3    permitted to do in the Oklahoma nursing act for an

4    RN versus an LPN?

5    A    I don't know what the RNs, you know -- all I

6    know is I've worked hospitals, I've worked prisons,

7    I've worked jails; and we do about the same thing

8    except they're -- they've got the title, they're

9    supervisors, they're people that we can go to in

10   case we have a problem or something.

11   Q    When you are informed that an inmate has had

12   a altercation with another inmate, are you provided

13   any training to assess their mental health needs?

14   A    It's just on-the-job trainings -- is what

15   we've had.

16   Q    And based upon your experience and on the

17   job, do you believe it is a good practice to perform

18   mental health assessments, when someone has a past

19   mental health diagnosis, when they have an

20   altercation with an inmate?

21              MR. NARENDRAN:  Object to form.

22              MS. REMILLARD:  Same objection.

23   Q    (By Mr. Franseen) You can answer.

24              MR. NARENDRAN:  Go ahead.

25   A    What was the question again, now?

1          MR. FRANSEEN:  (Addressing the court

2    reporter) Do you want to repeat the question?

3          THE COURT REPORTER:  Sure.

4          (The record was read as requested.)

5          MR. NARENDRAN:  Same --

6     A    Yeah.

7          MR. NARENDRAN:  -- objection.

8          THE WITNESS:  Yeah.  Okay.

9     A    Yes --

10         MS. REMILLARD:  Same.

11    A    -- sir.

12    Q    **(By Mr. Franseen) And why is that?**

13    A    Because we've done it ever since I've --

14    I've been a nurse.  I worked mental health at

15    High Point, and that's -- all was adolescent kids

16    and stuff.  And they -- they kind of train us --

17    they trained us to do assessments and stuff like

18    that.

19    Q    **And you -- because one of the things, if**

20    **someone has a mental health history and past, is**

21    **when they're acting out, that can be an indication**

22    **that they're having a crisis event, correct?**

23         MR. NARENDRAN:  Object --

24         MS. REMILLARD:  Object --

25    A    Not --

1                  MR. NARENDRAN:  -- to form.

2       A    -- necessar- --

3                  MS. REMILLARD:  Same objection.

4                  MR. NARENDRAN:  All right.  Go ahead.

5       A    Not necessarily.

6       **Q    (By Mr. Franseen) Well, when you say "not**

7  **necessarily," are you implying that sometimes it can**

8  **be and sometimes it's not?**

9       A    Well, that depends on the person and what

10  they're doing.  I've -- I've seen people act out and

11  not be mentally ill.

12      **Q    And if -- what if someone has a past history**

13  **of suicidal attempts?  Would you want to at least**

14  **assess their mental health at that time?**

15      A    Yes, sir.

16      **Q    And you would want to do that and document**

17  **whether you assessed their mental health if they had**

18  **that past history and acted out in that manner?**

19      A    Yes, sir.

20      **Q    And that would be important to document**

21  **because if it's not documented, there's no proof**

22  **that that assessment was performed.**

23                  MR. NARENDRAN:  Object to form.

24                  MS. REMILLARD:  Same objection.

25                  And, for the record, can one objection be

1  sufficient --

2          MR. FRANSEEN:  That's fine.

3          MS. REMILLARD:  -- for both of us?

4      Thank you.

5  A    Yes, sir.

6  Q    (By Mr. Franseen) And did you perform the

7  use of force evaluation related to Krysten Gonzalez

8  on January 8th, 2019?

9  A    Yes, sir.

10  Q    Have you reviewed any documents related to

11  that use of force assessment?

12  A    I looked at it the other day.

13  Q    And what did you look at?  Did it help you

14  refresh your memory?

15  A    I -- I remember that case.

16  Q    You remember that case?

17  A    I remember that case.

18  Q    Did any of the documentation help assist you

19  in refreshing your mem- -- your memory?

20  A    No, sir.

21  Q    So, you have an independent recollection of

22  that event involving Ms. Gonzalez?

23  A    Yes, sir.

24  Q    Let's start with your first involvement with

25  her on that date.

1      A    Okay.  She came to clinic.  They brought her

2    up to clinic with a inmate-on-inmate.  She came in

3    there.  She was laughing, carrying on.  I asked her

4    if she was injured.

5          She said "no."

6          She had some scratches on her neck and on

7    her arm.  There was no blood.  I cleaned them up,

8    just wiped them up to -- to be sure that they didn't

9    have any blood or anything.  I again asked her if

10   she was injured.

11         She said, "no," she didn't need any medical

12   service, that she was okay and she was fine, she

13   wanted to -- she said, "You ought to see the girl

14   that I fought.  I whipped her ass real well."

15     **Q    Anything else go on during that evaluation?**

16     A    No, sir.

17     **Q    Did you review her --**

18     A    I --

19     **Q    -- chart when you performed that evaluation?**

20     A    I looked at her chart, yes.  Uh-huh.

21         (Plaintiff's Exhibit Number 1 marked for

22   identification and made part of the record.)

23     **Q    (By Mr. Franseen) And I'm going to hand you**

24   **what's marked as Plaintiff's Exhibit No. 1.**

25     A    Uh-huh.

1                    MS. REMILLARD:   Thank you.

2          Q     (By Mr. Franseen) This is a -- the -- what

3     has been produced as the Post Use of Force

4     Assessment for Ms. Gonzalez.  Do you recognize that

5     document?

6          A     Yes.  It's one of our Post Use of Force.

7          Q     When you say "one" of them, are there

8     different Post Use of Force --

9          A     No.

10         Q     -- documents?

11         A     This is our -- this is our Post Use of

12    Force.

13         Q     So, that's the Turn Key Post Use of Force --

14         A     Uh-huh.

15         Q     -- Assessment; is that correct?

16         A     Uh-huh.

17         Q     Is that a "yes"?

18         A     Yes, sir.

19         Q     And there may be time to time where I

20    just --

21         A     Uh-huh.

22         Q     -- make sure it's --

23         A     Sorry.

24         Q     -- a verbal --

25         A     Yeah.

PROFESSIONAL REPORTERS
800.376.1006
proreporters.com

1     Q     -- response.

2           Have you given a deposition before?

3     A     Yes, sir.

4     Q     How many times?

5     A     Once -- no, twice.

6     Q     Were they involving your care provided at

7  Turn Key?

8     A     No, sir.

9     Q     Where were they -- what are -- what were

10  they related to?

11    A     One was at LARC.

12    Q     Where was the other one?

13    A     I got hit by a pickup; and --

14    Q     Okay.

15    A     -- so, it was that one.

16    Q     When looking at this Use of Force

17  Assessment, does this include all of the items and

18  questions that you would have asked Ms. Gonzalez?

19    A     Yes, sir.

20    Q     Does it properly document all of the inquiry

21  that you performed and the answers she gave?

22    A     Well, I didn't see in there that -- that

23  she -- what she said about the other patient.

24    Q     Okay.  So --

25    A     Yeah.

 1    Q    So, outside of that comment --

 2    A    Yes, sir.  Sh- --

 3    Q    -- that's not documented.  But does

 4  everything else -- as far as your interaction with

 5  her, is it documented?

 6    A    Yes, sir.

 7    Q    Would --

 8              THE COURT REPORTER:  If you --

 9    Q    (By Mr. Franseen) -- you agree --

10              THE COURT REPORTER:  -- could -- excuse

11  me.

12         If you could, wait till he completes his

13  question --

14              THE WITNESS:  Okay.

15              THE COURT REPORTER:  -- before you

16  answer.

17         Thank you.

18              THE WITNESS:  Okay.

19    Q    (By Mr. Franseen) Would you agree that on

20  this assessment there is no section that instructs

21  you to perform a mental health evaluation?

22    A    When they -- up here in the left-hand corner

23  here, they will usually have "mental health" if

24  they're mental health patients (Indicating).

25    Q    (By Mr. Franseen) So, the documentation

1   within Turn Key should indicate on this assessment

2   that they are mental health if they have been

3   determined to be mental health.

4       A    Yes, sir.

5       Q    How does that change your assessment if that

6   is missing from the me- -- the records?

7       A    If she has any indication that she has a

8   mental problem, then, you know -- the second girl

9   was crying, carrying on, upset.  I asked this

10  girl -- I -- I asked both of them if they needed to

11  talk to mental health.  I always ask them if they

12  need to talk to mental health.  If they decline --

13  and this one here said, "No.  You ought to see the

14  other girl."

15      Q    That is not what you testified to earlier,

16  is it?

17      A    Well, I don't know.

18      Q    When -- when I'm asking you the questions

19  directed about mental health, are you now saying

20  that you provided questions for mental health?  Is

21  that correct?

22      A    I always ask if they need mental health.

23      Q    You did not provide me that answer when I

24  asked you what you did --

25      A    No.

1    Q    -- regarding this assessment --

2    A    Well --

3    Q    -- did you?

4    A    -- sorry.  I left it out.

5    Q    And you also said you -- you sometimes ask

6    about mental health and you sometimes don't,

7    depending on the circumstances, correct?

8    A    Yes, sir.

9    Q    And you also testified that when mental

10   health is noted on a chart, you change your

11   assessment, correct?

12   A    Yes, sir.

13   Q    Have we discussed all of your interaction

14   with Ms. Gonzalez, regarding your use of force

15   assessment?

16   A    Okay.  After -- after I check them to see if

17   they're okay, we have them sign a waiver that --

18   that they're not hurt, that they're not injured.

19   We -- if they don't sign the waiver, the nurse and

20   the officer can sign the waiver if they refuse to

21   sign the waiver.  Then they take them back to -- to

22   their cell.

23        I also tell them if you have any problems --

24   medical problems or anything -- to be sure -- and I

25   put this down here -- to be sure and let medical

1  know right away (Indicating).

2      Q    On that did she -- do you recall whether she

3  signed that waiver or not?

4      A    I don't recall that.

5      Q    What does this -- this waiver, does it

6  include any sort of assessment for mental health?

7      A    It just says that they do not need medical

8  service; that they're not hurt, they're not injured;

9  that they don't need our -- our service.  And then

10  we tell them -- and it also has on there -- or we

11  put it on there that if you don't -- if you have any

12  injuries that you don't know about, then it could

13  cause -- it could cause headaches, diarrhea, nausea,

14  vomiting, and everything and even cause death.

15          And that's why I put down here that if you

16  have any problems, to be sure and let medical know

17  right away (Indicating).

18      Q    Would you agree it's important to have --

19  ask specific questions regarding mental health when

20  dealing with a mental-health-assigned patient?

21              MR. NARENDRAN:  Object to form.

22      A    No.  If they don't -- if they don't have any

23  indications that they are mental health, if it's not

24  on the chart, no.

25      Q    (By Mr. Franseen) Well, Ms. Gonzalez was on

1   mental health medication.  Were you aware of that?

2       A    No, sir.

3       Q    Were you aware that she was on Lexapro?

4       A    No, sir.

5       Q    Were you aware that she had had past suicide

6   attempts that were in her chart in Turn Key's

7   records?

8       A    No, sir.

9       Q    Would that have changed your assessment?

10      A    No, sir.

11      Q    Tell me what the -- when it indicates mental

12  health on this Post Abuse (sic) -- Post Use of Force

13  Assessment, how that changes your assessment.

14      A    If she -- if she showed any indications that

15  she was mental health, that she was having mental

16  problems, that would have changed my indication.

17      Q    If the chart indicated that on at least

18  two prior occasions, she had asked for change to her

19  anxiety meds, would that have changed your

20  assessment?

21      A    If I could have seen it, but, like I say,

22  what we -- we -- they bring them in, and we have to

23  assess them and see what they're doing.  She was not

24  showing any indication that she was mental health.

25      Q    Can you explain to me, when you said that

1   you looked at her chart, what you reviewed?

2       A    When -- when -- her face sheet comes up.

3   When we pull them up on the computer, her face sheet

4   comes up.  We see not just the Po- -- it won't say

5   "Post Use of Force."  It will have her name, her

6   picture and it'll have an alert if she's mental

7   health and it'll have "MHO" or "severe mental

8   health" or whatever.  That had nothing on her chart

9   that -- her face sheet that I saw.

10      Q    Would you agree that someone on mental

11  health medications and with past suicide attempts

12  should have a mental health indication on their

13  chart?

14              MR. NARENDRAN:  Object to form.

15      A    Not all of them.  Just because they're on

16  the medication doesn't mean that they're mental

17  health.

18      Q    (By Mr. Franseen) What if they have had past

19  suicide attempts?

20      A    That should have been on there.  I --

21      Q    What --

22      A    -- didn't --

23      Q    -- if -- what if they were ordered to Mental

24  Health Court and that is why they are being detained

25  at Oklahoma County Detention Center?

1      A     We couldn't see that.  I couldn't see that.

2      Q     So, there's noth- -- you -- whether you can

3    see it or not, if someone is being ordered to be

4    held because they are under Mental Health Court,

5    should that be noted in their chart and be assigned

6    in the mental health unit?

7      A     We don't have that on any of our charts,

8    that I know of.

9      Q     Well, you do have mental health notations

10   you can put on your charts.

11     A     Yes.

12     Q     And, so, that's what I'm asking you.  You

13   can use that designation for anyone who is assigned

14   to Mental Health Court while they are waiting

15   placement to an inpatient unit at Oklahoma County

16   Detention Center.

17     A     I don't know if they can put the charges

18   that -- that she's doing that.

19     Q     I'm not asking about the charges.  I'm

20   asking you can all -- put them under the

21   mental health description that you say can pop up

22   and be assigned.

23     A     We have alerts.

24     Q     And that alert can be used if someone is

25   on -- has been adjudicated to need Mental Health

1    Court.

2              MR. NARENDRAN:  Object to form.

3    A    I -- I'm -- I don't know.  It's never been,

4    you know -- I don't question what they alert.  I --

5    Q    (By Mr. Franseen) You do --

6    A    I --

7    Q    -- your job.

8    A    Yeah --

9    Q    And --

10   A    -- but --

11   Q    -- you don't -- you don't question how

12   they -- how they tell you to do your job.  You just

13   follow your job.

14   A    No, sir.  I -- if I see somebody that is

15   upset, crying, showing signs of mental health, I

16   immediately get them urgent-care mental health.

17   I -- I flag them to that.  She showed no signs of

18   mental health whatsoever.  She showed no signs of

19   going to commit suicide or anything like that.

20   Q    Did you ask her the questions that are under

21   a mental health evaluation?

22   A    No, sir.

23   Q    What is your next interaction with

24   Ms. Gonzalez?

25   A    She was hanging in the cell.

PROFESSIONAL  REPORTERS
800.376.1006
proreporters.com

1    Q    Can you describe to me where you were when

2  you received the alert?

3    A    We was getting on the elevator.  We had been

4  to another call.

5    Q    Another call as far as what?

6    A    As a gurney run -- what we call "gurney

7  runs."  Somebody else had had -- supposably had a

8  seizure or -- or something.  We get down there.

9  They were okay.  So, we were going back to the

10  elevator.

11    Q    And was -- at this time was medical still on

12  the 13th floor?

13    A    Yes.

14    Q    And, so, you're going back to the -- and

15  you -- something comes over the radio?  Is that how

16  this --

17    A    Yes.

18    Q    -- works?

19        Can you explain to me the process of what

20  you hear --

21    A    Okay.

22    Q    -- and what you do?

23    A    The officers have the radios.  We heard,

24  "Gurney on 6."  That's where she was.  And, so, we

25  had just left a different pod -- like, 12 or

1  something like that -- and we were getting on the

2  elevator and -- the officer, another LPN, and

3  myself -- with the gurney.

4         So, we run down to 6 with the gurney.  We go

5  over there.  The officer's standing at the door.

6  I'm not sure, exactly, if there was another officer

7  or what.  But, anyway, the other LPN and I went in.

8  And she was hanging at the end of her bed, a sheet

9  wrapped around her neck.  Ryan picked her up.  I

10  loosened the sheet.  We lowered her down.  We pulled

11  her out and started CPR.

12    Q    And was the sheet being tied to the top

13  bunk?

14    A    I really don't know where it was tied.  I --

15  probably.  I don't know.

16    Q    Would that -- based upon her positioning, is

17  that where you believe that the sheet was tied to?

18    A    Yes, sir.

19    Q    Did -- so, from the time someone was called

20  until you arrived, did anyone perform any

21  life-saving measures for her?

22    A    I can't say.  I wasn't there.

23    Q    No one had lifted her off the bed?

24    A    I -- I -- I don't know for sure.  There

25  might have been a officer in there, holding her up.

1    I -- I don't know.

2        Q    Would -- if there was an officer -- officer

3    holding her up, do you -- would you recall that?

4        A    I don't know.  It all happened so fast.

5    Once we got there, we just -- we got her down and --

6        Q    Do you know whether the facility has any

7    devices there to cut people down?

8        A    They do, but we did not have one --

9        Q    Why did you --

10       A    -- at the --

11       Q    -- not have one?

12       A    Because we don't have it on our cart.

13       Q    Why does the gurney run not have a device to

14   cut people --

15       A    They had --

16       Q    -- down?

17       A    -- scissors, but we didn't -- we didn't take

18   the time to get them out.  I mean --

19       Q    And -- and I'll just remind you to allow the

20   questions to fully complete before you start your

21   answers.

22       A    Sorry.

23       Q    On each floor are there devices to cut

24   people down from sheets?

25       A    I'm not sure.

1    **Q    There have been multiple hangings at**

2    **Oklahoma County Detention Center over the years,**

3    **hasn't there?**

4    A    I'm not sure.

5    **Q    When did you first start working at Oklahoma**

6    **County Detention Center?**

7    A    2018, November 1st.

8    **Q    So, you had only been there roughly two -- a**

9    **little over two months when this --**

10   A    Uh-huh.

11   **Q    -- event occurred?**

12   A    Yes, sir.

13   (Plaintiff's Exhibit Number 2 marked for

14   identification and made part of the record.)

15   **Q    (By Mr. Franseen) I'm going to hand you**

16   **what's been marked as Plaintiff's Exhibit No. 2.**

17   A    Okay.  On the above date and approx- --

18   MS. REMILLARD:  Thank you.

19   **Q    (By Mr. Franseen) Can you identify that**

20   **sheet -- that sheet?**

21   A    Yes, sir.

22   **Q    Please explain, for the record, what that**

23   **sheet is.**

24   A    This is a sheet -- this is a report that I

25   did after we got through with sending her out.

1    Q    And does that sheet seem to mimic what you

2    provided, as far as your testimony, as what

3    occurred --

4    A    Yes, sir.

5    Q    -- when you found her?

6         Is there anything in that statement that

7    says an officer was holding her up?

8    A    I'm not sure whether the officer was or not.

9    Like I say, I -- I don't recall.  It all happened so

10   fast.  I remember seeing the officer maybe at the

11   door, maybe.  You know, I don't know.

12   Q    Do you recall the name of that officer?

13   A    No, sir.

14   Q    From your recollection, were there specific

15   areas for mental health that had specific

16   mental-health psych checks at Oklahoma County

17   Detention Center?

18   A    Yes, sir.

19   Q    Where were those located?

20   A    On our floor -- for the women, on

21   13th floor.

22   Q    Where were the men?

23   A    13th floor, down at the other end of the

24   hall.

25   Q    In a different pod?

1     A    At the -- at this time, some of them was on

2    our floor; and some of them was -- no, it's -- it

3    was on the other end of 13th floor, in a different

4    unit/pod.

5        **Q    And did they -- so, they had women in one**

6    **section and men in a different section?**

7     A    Yes, sir.

8        **Q    But both were on 13th floor.**

9     A    Yes, sir.

10        **Q    How many beds did they have for mental**

11    **health at that time?**

12     A    For mental health?  At that time?  They have

13    a floor -- like, 12th floor has a lot of mental

14    health patients.  On our floor we have -- we have --

15    let's see.  We have 7, 8, 9, 10, 11, 12; but we mix

16    them up.

17        What we do is if we get a mental health

18    pers- -- a SP1 womans (sic) -- women, they go back

19    in the back of -- like, in Cell 10.  From 7 back,

20    they have for women.  The men, we put them on -- we

21    have two camera cells.  But we can put them on some

22    other -- in some other cells; but usually now they

23    send them to Char- -- 13 Charlie.

24        **Q    That's for SP1?**

25     A    For SP1s.

```
 1      Q    How many cells are in 13 Charlie?

 2      A    Ten, I think it is.

 3      Q    Is there a 13 Alpha?

 4      A    Yeah, Alpha, David, and Charlie.

 5      Q    Okay.  So, we've got 3 pods on --

 6      A    Uh-huh.

 7      Q    -- 13.

 8           Is that correct?

 9      A    Yes.

10      Q    And --

11      A    We --

12      Q    -- is it --

13      A    -- had four, counting Baker.  We've got

14   Alpha, Baker, Charlie, and David.  The women -- if

15   they're just mental hea- -- MHOs, mental health,

16   they go -- go to Apha (sic) -- Alpha on 13th floor.

17      Q    What is "MHO"?

18      A    "Mental" -- a "Mental Health Observation."

19      Q    How often are they checked when they're on

20   MHO?

21      A    The officers do that.  I don't know.

22      Q    And is that MHO different from SP1 and SP2?

23      A    Yes, sir.

24      Q    How many beds are available in Alpha while

25   someone is on MHO?
```

PROFESSIONAL  REPORTERS

800.376.1006
proreporters.com

1       A    I'm not sure.

2       **Q    Do you believe it's 10, 20?**

3       A    Okay.  Let's see.  I think there's,

4   like, 25.  I think there's 10 -- 10 or 11 to 25 --

5   numbers.

6       **Q    Okay.**

7       A    So --

8       **Q    I'm kind of confused when you say that,**

9   **yeah.**

10      A    Okay.

11      **Q    How many cells do you believe are in**

12  **13 Alpha?**

13      A    Okay.  It starts at 11 and goes around, I

14  think, to 25.  I'm not sure.  I don't go over there

15  all that much.

16      **Q    I think I'm kind of understanding what**

17  **you're explaining now.  So, the mental health**

18  **observation cells start at 11.**

19      A    Uh-huh, and goes to 25, I think.  I'm not

20  sure.

21      **Q    And are there one or can there be multiple**

22  **detainees in those cells?**

23      A    They can put two.

24      **Q    So, roughly, we have maybe 14 to 15 cells?**

25      A    Yes, sir.

1      Q      So, maybe 30 spots for --

2      A      Yeah.

3      Q      -- MHO?

4      A      Maybe.  Like I say, I don't go over there.

5  So, I don't know.  That's not my --

6      Q      We would be able to look at a schematic and

7  determine, starting at 11, what it goes to and up --

8      A      Yeah.

9      Q      -- to 2 spots per cell, correct?

10     A      Yes.

11     Q      And you said Cells 7 to 10 were for SP1?

12     A      Yeah, the women on our si- -- on Baker.

13     Q      That's on Baker.

14            Is there Cells 1 through 10 on Alpha?

15     A      Yes, sir.

16     Q      What are those assigned to?

17     A      Usually, pregnant women.

18     Q      Is it pregnant women and just kind of

19  general women's health --

20     A      Well --

21     Q      -- if they're in the wo- -- in the medical

22  unit?

23     A      Yes --

24     Q      Okay.

25     A      -- I do believe.

 1      Q    So, with Baker we've got 7 through 10 are

 2   SP1.  What's 1 through 7 on Baker?

 3      A    Our sick people.  If they have a CPAP, they

 4   have to be up there and -- like I say, just the sick

 5   ones and maybe they're old and frail, maybe -- just

 6   things like that.

 7      Q    And on the -- and does it go beyond 10 in

 8   Baker -- the --

 9      A    Well --

10      Q    -- number on the --

11      A    -- yes.

12      Q    -- cells?

13      A    Yes.  We have 1 through 11.  Then we have

14   20 through 25.

15      Q    What is Nos. 11 through 19?  What are those

16   assigned to?

17      A    11 through 19?  Well, ele- -- 11 -- okay.

18   11 is our female.  It can be -- it's not exactly for

19   SP1s, but we use them for them and sick women.

20          20 is a -- yeah, 20 and 21 are camera cells.

21   So, those are SP1s that we have to watch; or it

22   could be a inmate that is maybe not a SP1, but needs

23   to be watched or something like that.  And then from

24   22 on down is -- they could be, like, for sick

25   people for the higher charged people.

1    Q    And, so, for Alpha and Baker, have we talked

2    about all the medical placements that you're aware

3    of --

4    A    Uh-huh --

5    Q    -- for --

6    A    -- well --

7    Q    -- detainees at Oklahoma County Detention

8    Center?

9    A    For -- for sick -- for SP1s and mental

10   health.  Charlie and David are for our

11   insulin-dependent diabetics and for people who have

12   wheelchairs, who have -- can't defend themself --

13   like, if they have a broken arm, have a cast,

14   have -- any way that they can't defend themselves.

15   Q    So, does Charlie and David have women on

16   those --

17   A    No --

18   Q    Oh.

19   A    -- just Alpha --

20   Q    Okay.

21   A    -- and part of Baker.

22        MR. NARENDRAN:  Let him get his

23   question out.

24        THE WITNESS:  Oh.

25        MR. NARENDRAN:  It's all right.  It

1    happens.

2    Q    (By Mr. Franseen) So, Charlie and David have

3    no mental health assignments for women, correct?

4    A    No, sir.

5    Q    And we've discussed on Alpha and Baker what

6    the levels are and the number of beds, roughly, for

7    mental health are on 13 Alpha and Baker.

8    A    Yes, sir.

9    Q    Are you aware of any other locations that

10   include mental health observation or SP1 or SP2?

11   A    All of 12 -- Floor 12 -- has mental health

12   patients, as far as I know.  I don't go to the other

13   floors.  So, I'm not sure.  I know mental health

14   goes to 12, and I'm not sure which pod it goes to.

15   All floors have a Alpha, Baker, Charlie, and David.

16   Q    Were there any women assigned to cells for

17   mental health observation on 12?

18   A    No.  Those are -- as far as I know, they're

19   all men.

20   Q    So, as far as bed placements for mental

21   healthcare -- women -- there weren't on -- any

22   on 12.

23   A    No, as far as I know.

24   Q    Are you aware of any other floors that would

25   have had mental-healthcare-observation duties for

1  **women?**

2     A    The bottom floor where they bring them in,

3  we have women's holding; and I think there's -- I'm

4  not sure about how many cells are there because,

5  like I say, I don't go there that often; but I think

6  there's three or four that have -- for -- for

7  people -- mental health patients sometimes.

8     **Q    Are there any other locations within the**

9  **Oklahoma County Detention Center where women can be**

10  **placed on mental health observation?**

11     A    No, sir --

12     **Q    Would --**

13     A    -- well --

14     **Q    -- you agree --**

15     A    -- not that I --

16     **Q    -- that the sixth floor is not a floor that**

17  **has mental health observation and duties?**

18               MS. REMILLARD:  Object --

19     A    As far as --

20               MS. REMILLARD:  -- to form.

21     A    -- I know.

22               MS. REMILLARD:  You can answer.

23     A    As far as I know.

24               (Plaintiff's Exhibit Number 3 marked for

25  identification and made part of the record.)

1     Q     (By Mr. Franseen) I've got one last exhibit.

2     It's Plaintiff's Exhibit No. 3.  Are you familiar

3     with this document?

4                    MR. NARENDRAN:   Thank you.

5                    MS. REMILLARD:   Thank you.

6     A     This is the first time I've seen it.

7     Q     (By Mr. Franseen) Okay.  First time you've

8     seen it, but are you familiar with what that is

9     telling us?

10    A     Yes.

11    Q     What is that sheet telling us?

12    A     This is telling us what the -- suppo- --

13    somebody times, usually, I'm thinking.  It's the

14    wrong times.

15          Usually, if you -- if you start a code on

16    somebody or something, you have someone that times

17    everything that you do; and to me, this is what this

18    looks like.

19    Q     And does it seem to be timing the AED?

20    A     It could be.  I don't know.

21    Q     What are the -- when it -- after it says an

22    analysis next to a specific time, like "Analysis #1"

23    or "0" --

24    A     Uh-huh.

25    Q     -- does it say whether you can shock or not

1    **shock -- after that analysis?**

2        A    Electrode (sic) Placed.

3                THE COURT REPORTER:  Will you speak

4    up --

5        A    "Start of" --

6                THE COURT REPORTER:  -- a little,

7    please?

8        A    -- "Analysis."

9                THE COURT REPORTER:  Ma'am, will you

10   speak up?

11               THE WITNESS:  I'm just kind of reading

12   to see.

13       A    It didn't say to shock.

14       **Q    (By Mr. Franseen) It says "No Shock."**

15       A    Yes.

16       **Q    And then after "Analysis #1," what does it**

17   **state?**

18       A    "Start CPR."

19       **Q    Is this providing "No Shock," as well?**

20       A    "No Shock," yes.

21       **Q    Are you familiar with AEDs, why it -- it**

22   **states to not provide a shock?**

23       A    I'm fam- -- familiar with them a li- --

24   yeah.

25       **Q    Did Ms. Gonzalez have a pulse when you**

1    arrived?

2        A    No, sir.

3        Q    **Did she have enough electrical activity to**

4    **where an AD- -- -ED machine could be used?**

5                MR. NARENDRAN:  Object to form.

6        A    I don't even remember putting it on.

7    Mar- -- Ryan might have put it on her.  I don't

8    remember.  I just remember that we pulled her out

9    and started CPR because we had no pulse.

10       Q    **(By Mr. Franseen) Was she cold to the touch?**

11       A    She was cool.  She wasn't cold.

12       Q    **She had been hanging there for a while,**

13   **hadn't she?**

14               MR. NARENDRAN:  Object to form.

15       A    Not -- I can't determine that.  I don't

16   know.

17               MR. FRANSEEN:  No further questions.

18               MR. NARENDRAN:  I'll reserve until

19   trial.

20               MS. REMILLARD:  And same with us.

21               MR. NARENDRAN:  She'll read and sign.

22               THE VIDEOGRAPHER:  And I'm off

23   videotape record.  The time is 10:30 a.m.

24          (Witness excused; signature required.)

25          (Deposition adjourned at 10:30 a.m.)

PROFESSIONAL REPORTERS
800.376.1006
proreporters.com