## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

GABRIELLE K. PASQUALETTI, as )
Special Administrator for the Estate of )
Krysten Mischelle Gonzalez, )
deceased, )
                        )
          Plaintiff, )
                        )
-vs- )      Case No. CIV-21-0011-F
                        )
SHERIFF TOMMIE JOHNSON, III, )
in his official capacity; P.D. Taylor, )
individually; and TURN KEY )
HEALTH CLINICS, LLC, )
                        )
          Defendants. )

## ORDER

Krysten Mischelle Gonzalez, a 29-year-old pretrial detainee at the Oklahoma County Detention Center, tragically died by suicide on January 8, 2019. Plaintiff Gabrielle K. Pasqualetti, as Special Administrator for the Estate of Krysten Mischelle Gonzalez, deceased, brings this action against defendants Sheriff Tommie Johnson, III, in his official capacity, and Turn Key Health Clinics, LLC pursuant to 42 U.S.C. § 1983.[1] (The operative facts in this action transpired in and before January, 2019, so the county sheriff defendant was originally Sheriff P.D. Taylor.

---

[1] Kelly Kirkendall-Heller originally commenced this action on behalf of herself and Ms. Gonzalez's estate. Subsequently, Ms. Kirkendall-Heller died, and upon her appointment as special administrator for Ms. Gonzalez's estate, Ms. Pasqualetti was substituted in place of Ms. Kirkendall-Heller. *See*, doc. nos. 30, 32. Prior to Ms. Kirkendall-Heller's death, the court dismissed with prejudice Ms. Kirkendall-Heller's individual claims against defendants. *See*, doc. no. 22.

Sheriff Tommie Johnson III, in his official capacity, was substituted in as a defendant on June 15, 2021.  Doc. no. 21.)

Plaintiff claims defendants violated Ms. Gonzalez's constitutional rights under the Eighth Amendment and Fourteenth Amendment to the United States Constitution through their deliberate indifference to her substantial risk of suicide. Plaintiff seeks to recover money damages from defendants resulting from the alleged constitutional violations.[2]  After conducting discovery, defendants have moved, pursuant to Rule 56(a), Fed. R. Civ. P., for entry of summary judgment on plaintiff's claims.  *See*, doc. nos. 109 and 111.  Upon due consideration of the parties' submissions, the court makes its determination.

## I. Summary Judgment Standard

"Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Estate of Beauford v. Mesa County, Colorado, 35 F.4th 1248, 1261 (10th Cir. 2022) (internal quotation marks and citations omitted).  "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*. (citation omitted).  "The summary judgment standard requires [the court] to construe the facts in the light most favorable to the nonmovant and to draw all reasonable inferences in [her] favor."  *Id*. (citation omitted).

---

[2] Tommie Johnson III, current Sheriff of Oklahoma County, was substituted as defendant in place of the Board of Commissioners of Oklahoma County.  *See*, doc. no. 21.  Mr. Johnson is named only in his official capacity.  The Board was dismissed from the lawsuit under Rule 12(b)(6), Fed. R. Civ. P.  *Id*.

P.D. Taylor, former Sheriff of Oklahoma County, was named as defendant only in his individual capacity.  Upon the filing of a Rule 12(b)(6) motion, the claims alleged against him by plaintiff as special administrator of the estate were dismissed without prejudice based on qualified immunity. *See*, doc. no. 22.

"'The burden on the moving party may be discharged by "showing"–that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" Schneider v. City of Grand Junction Police Dept., 717 F.3d 760, 767 (10th Cir. 2013) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)) (alteration omitted). "'A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [her] pleading, but must set forth specific facts showing that there is a genuine issue for trial.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)) (alteration omitted and added).

## II. Relevant Facts

The following relevant facts are taken from the record and presented in the light most favorable to plaintiff.

Arrest, Booking, and Cell Assignment

During the early morning hours of October 11, 2018, an Oklahoma City police officer arrested Krysten Mischelle Gonzalez (Gonzalez) on an outstanding Oklahoma County warrant for failure to appear in criminal case, CF-2017-4065. Gonzalez had been charged in that case with the felony offense of possession of a controlled dangerous substance (methamphetamine) with intent to distribute. The officer transported Gonzalez to the Oklahoma County Detention Center (Jail) for booking. Upon her arrival at the Jail, Gonzalez was noted to be uncooperative and combative.

In addition to the Oklahoma County warrant, Gonzalez had an outstanding Tulsa County warrant for failure to appear in criminal case, CM-2018-104. Gonzalez had been charged in that case with misdemeanors of obstructing an officer and possession of drug paraphernalia. Tulsa County requested a hold placed on Gonzalez for that outstanding warrant. Further, a hold was placed on Gonzalez at

3

the request of the "Oklahoma City Marshal," doc. no. 109-1, at 1, 15, for outstanding fines.

At all relevant times, the Oklahoma County Sheriff operated the Jail, and Turn Key Health Clinics, LLC (Turn Key), a private entity, was under contract to provide dental, medical, and mental health care to the Jail's pretrial detainees. Turn Key's duties included providing recommendations to the Jail's classification unit of a pretrial detainee's status with respect to mental health needs for housing purposes.

The Oklahoma County Sheriff had established procedures for management of potentially suicidal pretrial detainees. All pretrial detainees were to be screened by a nurse or other authorized health care staff for both obvious and subtle signs of the potential for suicide prior to the completion of the booking process.

Pretrial detainees with the status of Level I Suicide Precautions (SP1) were to be observed continuously by detention officers on a 24-hour basis. Pretrial detainees with the status of Level II Suicide Precautions (SP2) were to be observed by detention officers at irregular intervals, not to exceed 15 minutes. The female SP1 and SP2 pretrial detainees were housed on the Jail's 13th floor.

Another status category for pretrial detainees with mental health needs was Mental Health Observation. This was the least restrictive status for pretrial detainees with mental health needs. Mental Health Observation pretrial detainees were to be housed in a different area from those classified as General Population, and they were to be observed by detention officers at irregular times, every 30 minutes. The Mental Health Observation pretrial detainees were also housed on the Jail's 13th floor.

Pretrial detainees with the status of General Population were housed randomly in the Jail and were to be observed by detention officers at irregular times, every 60 minutes.

Although pretrial detainees were assessed at the time of intake, they could be reassessed when there was a change in circumstances.

At approximately 3:02 a.m. on October 11, 2018, an unidentified prescreen staff member dated and signed a pre-booking screening form. The form indicated that Gonzalez's immediate health needs or problems were "Hypogly" and "Seizures." Doc. no. 109-2, ECF p. 48. The form was not completed in full. Specifically, answers were not provided to all questions, including "Are you suicidal or thinking of hurting yourself?" or "Have you tried or considered hurting yourself within the last month?" *Id*. "MHO" was written at the top of the form. *Id*.

Turn Key's corporate representative, Alicia Irvin (Irvin), and Gene Bradley (Bradley), who was, at all relevant times, an assistant Jail administrator, testified in deposition that "MHO" refers to the Mental Health Observation status.

According to Turn Key's electronic records, Rebecca Cargill (Cargill), a licensed practical nurse, began interviewing Gonzalez for intake screening at approximately 6:34 a.m. Doc. no. 109-2, ECF p. 1. Cargill first conducted a Tuberculosis screening and a PREA risk assessment. At approximately 6:41 a.m., she began a mental health screening of Gonzalez. Cargill reported in the record that Gonzalez was able to answer questions coherently.

Gonzalez responded negatively to questions about "currently on medications for depression, psychosis, or other mental health conditions," "currently thinking of killing or hurting [herself]," "attempt[ing] to harm [herself] within the past year," and having "nothing to look forward to in [her] future." Doc. no. 109-2, ECF p. 2. In addition, according to Cargill, Gonzalez did not present "any signs or conditions of recent suicide attempts or self harm." *Id*.

Gonzalez responded affirmatively to Cargill that she had seen "a mental health professional for emotional or mental health problems." Doc. no. 109-2, ECF p. 2. Specifically, she indicated "Crisis Center, Red Rock." *Id*. But Gonzalez indicated that her hospitalization had not been in the last seven years. *Id*. Gonzalez also responded affirmatively that she had been "hospitalized for traumatic brain injury"

in 2017. *Id*., ECF p. 3. Cargill reported that Gonzalez did not "appear sad, irritable, emotionally flat, or showing signs of other mental illness such as acting strange or any unusual behavior[.]" *Id*.

Turn Key's electronic records indicated that Cargill's "Disposition/Plan of Action" for Gonzalez was "No MH Symptoms – General Population," doc. no. 109-2, ECF p. 3.

Cargill also conducted a medical screening. Gonzalez reported an allergy to Penicillin. Cargill reported "NO MEDS" for current medications. Doc. no. 109-2, ECF p. 4. Gonzalez reported using or having used "IV METH and HEROIN" and having had or currently having withdrawal symptoms when she stopped drugs or alcohol. *Id*., ECF p. 5. Cargill reported that she "[r]ecommended housing based on medical/mental health evaluation" as "General Population." *Id*.

Cargill dated and signed the incomplete pre-booking screening form as of 6:46 a.m. As has been noted, "MHO" was written at the top. Irvin, Turn Key's corporate representative, testified in deposition that she was not familiar with the pre-booking screen form signed by Cargill, and she did not know why that form was filled out. Doc. no. 119-1, ECF pp. 5-6. According to Irvin, a communication relocation form needed to be filled out as to the status of a pretrial detainee. However, no communication relocation form for Gonzalez was produced during discovery.

Bradley, the assistant Jail administrator, testified in deposition that pretrial detainees were assessed at intake as SP-1, SP-2, and MHO. Based on answers given to intake questionnaires, intake forms were completed and provided to the Jail's classification officer who would then place pretrial detainees in a housing unit appropriate for their assigned status.

Bradley also testified that the Jail did not have minimum criteria for determining whether pretrial detainees should be placed in Mental Health Observation status. According to Bradley, that decision was left up to OU's

Department of Psychiatry.  Irvin testified that the criteria for identifying the Mental Health Observation status was patient dependent and based on clinical judgment.

After intake screening, Gonzalez was assigned to General Population and housed in a cell located on the 6 David pod.

Prior Jail History

Gonzalez had been previously booked into the Jail on eight occasions.  The first time was November 16, 2016.  In October, November, and three times in December of 2017, pre-booking screening forms for Gonzalez contained "MHO" notations.  Doc. no. 119-3, ECF pp. 9-11; 14-15.  On the same date as Gonzalez's pre-booking screening on December 2, 2017, a "Healthcare Observation" form for "Mental Health" was completed, which stated Gonzalez was not in touch with reality and described the approved property allowed for her.  *Id*. at p. 12.  In addition, the pre-booking screening form for October 6, 2017, stated "MHO 6-22-2017."  *Id*., ECF p. 15.

Gonzalez's pre-booking screening form in March of 2018 did not have any "MHO" notation.  However, it indicated that she had been in "Hope" treatment center "a month and a half ago," and listed medications of Prozac, Minipress, Trazadone, Vistaril, and Zyprexa.  Another medication listed on the form was Neurontin.  Doc. no. 119-3, ECF p. 8.

Electronic records from previous custodial stays at the Jail indicated that Gonzalez reported in November of 2016 and in October of 2017 that she had attempted suicide by jumping out of a moving car, cutting her wrists, and taking pills.  Doc. no. 118-1, ECF pp. 1-2.  They also indicated that she reported in November of 2017 she had been hospitalized (three weeks in Kentucky and three days in Tennessee) for trying to kill herself.  *Id*., ECF p. 5.  Further, they indicated that she reported she had tried to slit her wrist, she had run "into coming traffice [sic] on foot" and had taken "70 pills a mixture narc and non narc."  *Id*.

<u>Dental, Medical and Mental Health Care in October of 2018</u>

Between October 13 and 15, 2018, Gonzalez underwent a drug and alcohol assessment in the morning and at night.  Gonzalez denied signs or symptoms of detox, and on two occasions, refused a vital sign check.  Gonzalez was screened for suicide each time, and she denied "thinking of hurting [herself]."  Doc. no. 111-3, ECF pp. 110, 112, 114, and 116.

On October 16, 2028, five days after booking, Gonzalez underwent a routine mental health evaluation performed by a licensed professional counselor, Jeanetta Loudermilk (Loudermilk).  Gonzalez self-reported that she had a diagnosis of "Anxiety; Depression; [and] PTSD."  Doc. no. 109-2, ECF p. 13.  She also self-reported that she had "seizures and [was] not sleeping well, and having some difficulty remembering things."  *Id*.  Further, she indicated that she needed her medications, Prozac, Buspar, Trazadone, and Neurontin, restarted.  According to Gonzalez, she had taken those medications as recently as one week ago, prior to her arrest.  *Id*.

The next day, October 17, 2018, Gonzalez was seen by Dr. Jacob Strohl (Dr. Strohl), a resident in psychiatry at OU Health Sciences Center.  Dr. Strohl noted that Gonzalez's current housing status was General Population.  Gonzalez self-reported that she had "hypervigilance, nightmares, startled response, dissociation related to a rape at 17 [years old]."  Doc. no. 109-2, ECF p. 13.  A review of the medical records by Dr. Strohl showed "prior scripts for buspirone and fluoxetine."  *Id*.  Gonzalez described poor sleep secondary to nightmares and noted increased depression and anxiety.  She also self-reported a history of seizures.  Gonzalez denied any suicidal/homicidal ideation, and Dr. Strohl assessed her current symptom severity as "Mild-No significant impact on inmate's ability to function in her current setting."

*Id*., ECF p. 14.  Dr. Strohl's treatment plan for Gonzalez was to start medications of Fluoxetine (the generic form of Prozac), Buspirone (Buspar), and Terazosin.  *Id*., ECF p. 15.  He reviewed the treatment plan with his attending, Dr. Gabriel Cuka (Dr. Cuka), a board-certified psychiatrist.  He scheduled a 30-day follow-up appointment for Gonzalez and indicated that she communicated a willingness to notify security/medical personnel of any suicidal/homicidal ideation or intent.  *Id*. Dr. Strohl created an alert that Gonzalez was a mental health patient.  Doc. no. 109-2, ECF p. 39.

On October 18, 2018, Gonzalez was evaluated by Carri Matthies (Matthies), a registered nurse, for a headache from hitting her head.  Gonzalez reported she had a history of seizures and migraines.  She was prescribed Acetaminophen by Dr. Kent King (Dr. King) for seven days.  Gonzalez informed Matthies that she had not been on Amitriptyline for her seizures and stated that she wanted to see the doctor.

The next day, October 19, 2018, Gonzalez was evaluated by James Constanzer (Constanzer), an advanced practice registered nurse, for her reported history of seizures.  He prescribed Oxcarbazepine (Trileptal) for her.

On October 24, 2018, a case manager with Red Rock Behavioral Health Services, a court-appointed treatment provider, visited Gonzalez to perform an evaluation to assess Gonzalez's criteria for inpatient services and to effectively place her name on a waiting list until a state treatment bed became available.  Due to failures on the part of the case manager, Gonzalez's name was never placed on a waiting list for treatment bed availability.

On October 25, 2018, Gonzalez was evaluated by Tadasha Morris (Morris), a licensed practical nurse, for a complaint of shoulder pain on left side which Gonzalez believed was related to seizures.  Ibuprofen was ordered for her pain.

Two days later, on October 27, 2018, Gonzalez was evaluated by Matthies for a complaint of neck, back and left arm pain.  Acetaminophen was ordered.

On October 29, 2018, Toni Woods (Woods), a registered nurse, performed a history and physical evaluation of Gonzalez. Woods noted Gonzalez was currently taking Ibuprofen, Oxcarbazepine, Acetaminophen, Fluoxetine, Buspirone, and Terazosin. Gonzalez reported that she had been hospitalized in Norman for PTSD in June of 2018, that she took medications for a mental health condition, and had seriously hurt herself or tried to commit suicide "x8, 6/2018, a shot of heroin." Doc. no. 111-3, ECF p. 94. However, she denied "currently considering hurting [herself] or committing suicide." *Id*. Woods found Gonzalez's mental status/orientation as "unremarkable." *Id*. Woods indicated "Disposition" for "Housing" was "General Population." *Id*., ECF p. 96.

On October 30, 2018, Gonzalez was evaluated by Morris for a complaint of pain due to multiple decaying teeth. No medication was given because Gonzalez was currently on Ibuprofen.

Dental, Medical and Mental Health Care in November of 2018

On November 1, 2018, Gonzalez submitted a sick call request form requesting to see mental health about her medicine. Morris created a mental health referral on November 2, 2018.

On November 2, 2018, Gonzalez submitted a sick call request stating that she had been having horrible migraines and swelling and soreness in her throat.

On November 5, 2018, Gonzalez was seen by a dentist, Dr. Tanner Hays (Dr. Hays), for decaying teeth. Gonzalez indicated she wanted to save her remaining teeth, as she was hoping to get out soon. Dr. Hays prescribed Clindamycin and Ibuprofen for seven days for Gonzalez.

Later that day, Gonzalez was seen by Samantha Valencia (Valencia), a licensed social worker, for the mental health referral. Gonzalez stated "no not right now" when Valencia asked about her current mental health needs. Doc. no. 109-2, ECF p. 19. Valencia observed Gonzalez in cell at door as "calm and cooperative."

*Id*.  Valencia stated that Gonzalez would remain on "current status," and she indicated that Gonzalez was educated as to how to request mental health attention if the need arose.  *Id*.

Shortly thereafter, Gonzalez was evaluated by Morris for a complaint of an upset stomach, cramping and flatulence.  She was "instructed to increase water intake, daily fibrous foods, avoid straining when passing stool, medication use and follow-up in sick call if no relief."  Doc. no. 111-3, ECF p. 86.  She was prescribed Pink Bismuth by Dr. King.

On November 12, 2018, Gonzalez submitted a sick call request form which requested to be put on Trazadone for sleeping.  She reported that she was only sleeping three hours a night.  She was referred to mental health.

On November 16, 2018, Gonzalez submitted a sick call request form complaining of a toothache.

On November 17, 2018, Gonzalez was seen by a licensed professional counselor, Michael Hanes (Hanes), for the mental health referral.  Hanes reported Gonzalez was seen face-to-face.  She complained of "not sleeping very well[.]"  She stated that "they do not have me on my trazodone . . . could they up my Bus[p]ar . . . . It is not working very well[.]"  Doc. no. 111-3, ECF p. 84.  Hanes reported that Gonzalez was not distressed and denied intent to harm herself or suicidal thoughts.  Hanes made a referral to a psychiatrist.

That same day, Gonzalez was evaluated by Morris for Gonzalez's complaint of pain from bottom teeth.  Ibuprofen was ordered.

On November 19, 2018, Gonzalez was seen by Dr. Hays, who recommended extracting Gonzalez's decaying teeth.  Gonzalez was unwilling to undergo extraction of the teeth.  Dr. Hays prescribed Clindamycin and Ibuprofen for seven days.

On November 20, 2018, Gonzalez was seen by Dr. Cuka for a medication follow-up.  Gonzalez self-reported that Prozac "makes [her] suicidal" and she "had

all [her] suicide attempts while taking [the drug]."  Doc. no. 111-3, ECF p. 77.  She stated that Terazosin was "OK[.]" *Id*., ECF p. 79.  In addition, she self-reported that anxiety was still a problem, and she wanted an "outpatient regimen of Buspar 30 mg. bid restored."  *Id*.  Dr. Cuka agreed to make medication changes.  He discontinued the Prozac, added Lexapro, and advanced Buspar from "15 mg to 30 mg bid."  *Id*. at ECF 53.  He kept Gonzalez on Terazosin.  *Id*.  Dr. Cuka scheduled a psychiatry follow-up in 30 days.

During her evaluation by Dr. Cuka, Gonzalez denied "Suicidal/Homicidal Ideation" and "thoughts/plans of self-injury/homicide."  Doc. no. 111-3, ECF p. 78. Dr. Cuka noted Gonzalez's current housing status was General Population, and he indicated that Gonzalez's current symptom severity was "Mild-No significant impact on inmate's ability to function satisfactorily in the current setting."  *Id*., ECF pp. 77-78.

On November 29, 2018, Gonzalez was seen by Morris for a complaint of a broken right upper molar.  Ibuprofen was ordered.  Gonzalez also requested a change in her seizure medication and to have medication for her neuropathy.  Constanzer prescribed Levetiracetam (Keppra) for Gonzalez on November 30, 2018.

Dental, Medical and Mental Health Care in December of 2018

On December 2, 2018, Gonzalez submitted a sick call request because her face was swollen on the left side.  She was seen by Shirley Hadden (Hadden), a registered nurse.  Hadden notified Dr. King, who diagnosed an allergic reaction and prescribed Zyrtec and Benadryl.

On December 4, 2018, Gonzalez refused a sick call visit.

On December 6, 2018, Gonzalez submitted a sick call request requesting to be seen for a swollen face, swollen gums and tooth abscess.

Gonzalez submitted a sick call request form dated December 7, 2018, requesting to change her anxiety medication to "Zyprexa" because she felt the

"Bus[par]" was not "working anymore." Doc. no. 109-2, ECF p. 55. Morris wrote a mental health referral on December 10, 2018.

On December 7, 2018, Gonzalez was evaluated by Morris for Gonzalez's complaint of dental pain and swelling. Ibuprofen was ordered by Dr. King for seven days.

Three days later, on December 10, 2018, Gonzalez was seen by Dr. Hays for treatment of a broken upper molar. Dr. Hays recommended extraction, but Gonzalez declined. Dr. Hays proscribed Amoxicillin and Ibuprofen for seven days.

On December 11, 2018, Gonzalez was seen by Valencia per the mental health referral by Morris. When asked about her current mental health needs, Gonzalez stated she needed her "meds adjusted." She felt like she needed "a stronger dose of the Lexapro" and wanted "to have Zyprexa added in lieu of Buspar BID." She reported she took Zyprexa "on the outside." She reported her provider as "Red Rock." Doc. no. 111-3, ECF p. 71. Valencia indicated that Gonzalez did not "appear to show any signs of mental health concerns," and that she would "remain on current status." *Id*. Valencia made a referral to a psychiatrist.

The next day, December 12, 2018, Dr. Strohl reported that Gonzalez's medication changes were last made on November 20, 2024, and it was too early to evaluate for efficacy. Doc. no. 111-3, ECF p. 51. He ordered that Gonzalez's medications should remain the same until the follow-up appointment scheduled for December 24, 2018. He reported that he reviewed the matter with Dr. Cuka.

On December 18, 2018, Gonzalez was seen by Morris for a complaint of back pain. Gonzalez requested Naproxen, which Dr. King prescribed for seven days. Doc. no. 111-3, ECF p. 68. She was "instructed to avoid heavy lifting, strenuous work/activity until problem resolved, medication use, follow-up sick call if no improvement." Doc. no. 111-3, ECF p. 70.

On December 24, 2018, Dr. Cuka had a medication follow-up appointment with Gonzalez, and he noted "no report of problems with effectiveness or adverse side effects or new problems." Doc. no. 111-3, ECF p. 50.

Five days later, on December 29, 2018, Morris received an undated sick call request form from Gonzalez, requesting "Can I change my anxiety meds Please," with a smiley face underneath the request. Morris made a mental health referral. Doc. no. 109-2, ECF p. 46; Doc. no. 111-3, ECF p. 50.

On December 31, 2018, Gonzalez submitted a sick call request form to request a restart of Naproxen.

Medical and Mental Health Care in early January of 2019

On January 1, 2019, Randi Rice, a licensed professional counselor, rescheduled an appointment that day for the mental health referral for Gonzalez's request to change her anxiety medications. Doc. no. 111-3, ECF p. 50.

On January 2, 2019, Holly Martin, an advanced practical registered nurse, prescribed Naproxen for Gonzalez.

On that same day, January 2, 2019, Deborah Chesser (Chesser), a licensed professional counselor, saw Gonzalez per the mental health referral. Gonzalez reported to Chesser she "thinks the Lexapro is making her stomach hurt" and she "wants to change to something else." Doc. no. 111-3, ECF pp. 50, 67. Chesser indicated that Gonzalez appeared to be "currently stable, no overt signs of mental health concern" and would "remain on current status." *Id*.

Irvin, Turn Key's corporate representative, testified in deposition that after a sick call request to change anxiety medication was received by medical, an appointment "would typically be made within a seven-day to two-week period." Doc. no. 118-5, ECF p. 32, ll. 3-4, ll. 19-35; ECF p. 33, l. 1.

Dr. Strohl testified in deposition that if someone on a medication such as Prozac asked to change medication, he would probably want to personally interview

the person the same day or the next day.  Doc. no. 118-6, ECF p. 17, ll. 17-22, p. 18, ll. 1-2.

Dr. Strohl testified he did not see anything in the records to show that he or Dr. Cuka were informed of Gonzalez's sick call request to change her anxiety medications.  He also testified it would have been important for that type of request to be passed along to the doctor overseeing Gonzalez, and that he would want to know why she was asking to change her anxiety medications.  Doc. no. 118-6, ECF p. 6, ECF p. 35, ll. 16-24; ECF p. 36, ll. 1-5, 7- 10, 12.

Dr. Strohl also testified that if someone had had eight prior suicide attempts, it would be important to follow up on a request to change her medications and to evaluate her for suicide watch.  *Id*., ECF p. 37, ll. 9-18.

Turn Key's electronic records indicated Chesser made a referral to a psychiatrist about Gonzalez's concern "[L]exapro is making her stomach hurt and wants to change meds," and that Dr. Cuka had a scheduling conflict for appointments on January 4, 2019 and January 8, 2019.  Doc. no. 111-3, ECF p. 50.

January 8, 2019 – Physical Altercation and Suicide

At approximately 12:56 p.m. on January 8, 2019, Gonzalez and her cellmate were involved in a physical altercation.  The pretrial detainees were housed in cell 6 David 49.    Antoinette Adams (Adams), a senior Jail detention officer who was roving the 6 David floor, was notified by "[Camera-ops via radio]" of a possible altercation in the cell 6 David 49.  Doc. no. 111-15, ECF p. 1.  After witnessing the pretrial detainees punch each other, Adams called for assistance, and both were removed from the cell.

Adams escorted Gonzalez to the medical clinic.  She noticed Gonzalez had superficial scratches on the left side of her neck and on her right knuckle.  When Adams asked Gonzalez why she fought with her cellmate, Gonzalez responded that she "just needed a break."  Doc. no. 111-14, ECF p. 15, l. 13.

Sandra Zoski (Zoski), a licensed practical nurse, conducted a post use of force assessment on Gonzalez. According to Zoski, Gonzalez "was laughing, carrying on." Doc. no. 109-4, ECF p. 2, l. 3. Gonzalez denied that she was injured. Zoski provided wound care to Gonzalez for her scratches on the neck and right knuckle.

Zoski asked Gonzalez again if she was injured, and Gonzalez responded she "was okay" and "was fine." Gonzalez also stated, "You ought to see the girl that I fought. I whipped her ass real well." Doc. no. 109-4, ECF p. 17, ll. 11-14.

According to Zoski, Gonzalez did not show any "signs of mental health whatsoever" or "signs of going to commit suicide or anything like that." Doc. no. 109-4, ECF p. 3, ll. 18-19. However, Zoski did not ask Gonzalez any questions to conduct a mental health evaluation.

At 1:20 p.m., Adams escorted Gonzalez back to the 6 David pod. She placed her into another cell, 6 David 17, to avoid any further altercations with the cellmate. Gonzalez was housed by herself.

Angel Bell (Bell), another Jail detention officer, conducted a sight check of Gonzalez's cell at 2:02 p.m.

The Jail's video surveillance revealed that at 2:40 p.m., a blanket was hung from the top of Gonzalez's bunk.

Bell conducted another sight check of Gonzalez's cell at 3:18 p.m. Bradley testified in his deposition that according to Bell, she observed Gonzalez leaning forward on her bed, and when she hit the wand to the cell door, it made a noise, and Gonzalez raised her head up and made eye contact with Bell.

In a report after Gonzalez's suicide, Bell stated that upon arriving at Gonzalez's cell to do the sight check, she scanned the wand and looked through the door to find Gonzalez "sitting on the bottom bunk slouched over leaning up to look at [her]." Doc. no. 109-7.

At approximately 4:07 p.m., Adams escorted Isela Corpus Rivas, a licensed practical nurse, on the 6 David pod to pass medications to inmates.  When they arrived at Gonzalez's cell about 4:20 p.m., Adams looked in the cell window, but she was not able to see Gonzalez because of the blanket hanging over the top of the bunk.  Adams opened the door, and she asked Gonzalez if she wanted her medication.  When Gonzalez did not respond, Adams entered the cell.  She found Gonzalez's upper body suspended by a sheet, with one end wrapped around her neck and the other end tied to a metal object attached to the bunk.  Gonzalez's arms were hanging down and she was motionless and unresponsive.  Doc. no. 111-15, ECF pp. 2-3; doc. no. 118-2, ECF p. 1.

Adams called for a nurse and gurney, advised she had an inmate "hanging," and retrieved a cut down tool to cut the sheet.  She freed Gonzalez, who fell to the floor.  Adams was unable to move Gonzalez.  Two nurses arrived, pulled Gonzalez out of the corner of the cell and started cardiopulmonary resuscitation.  Doc. no. 111-15, doc. no. 118-2.

Emergency Medical Services Authority and the Oklahoma City Fire Department were dispatched to the Jail.  Gonzalez was subsequently transported to OU Health Medical Center where she was pronounced dead.  Doc. no. 118-2, ECF p. 2.

Phillips Hall (Hall) and M. deMarc Lyon (Lyon), investigators with the Jail's Special Investigations Unit, interviewed the cellmate with whom Gonzalez had the physical altercation.  The cellmate reported that she and Gonzalez were both having a bad day when they got into an argument which led to the physical altercation.  The cellmate stated that Gonzalez had recently been upset and had thoughts of hurting herself.  The cellmate stated that Gonzalez had not reported this information, but she observed Gonzalez fill out a sick call request form, which indicated that she was not feeling like herself.  Doc. no.  118-2; ECF p. 2.

Another inmate was also interviewed by the investigators. She stated that Gonzalez had given her a note earlier in the day in which Gonzalez apologized for saying the word "nigger." In the note, Gonzalez also stated "she had been upset all week and wanted to hurt herself because she wasn't getting out." Doc. no. 118-2, ECF p. 2.

Hall found a sick call request form in Gonzalez's cell dated "Tuesday."[3] Gonzalez requested to be seen for mental health, and she wrote on the side of the note, "MENTAL HEALTH URGENT." Doc. no. 118-2, ECF p. 3. She stated that she had "been trying to get put on my 10mg Zyprexa . . . for almost 3 weeks," had "2 sick calls and talked to 2 people[.]" *Id*. She stated that "I feel like I am going to have a breakdown & having thoughts I don't normally have." *Id*.

In his investigation report, Hall stated that Gonzalez "was found hanging from a tied sheet in the corner of her cell." He observed "a sheet tied to the top bunk in the farthest corner from the cell door" and "[t]he sheet had been cut." Doc. no. 118-2, ECF p. 2.

Also, in his report, Hall stated: "At 3:18.21, a sight check was seen having been performed on Cell 17 however the blanket was still hanging from the top bunk so it is unknown if the Officer [Bell] observed Gonzalez anywhere in the cell." Doc. no. 118-2, ECF p. 2.

Lyon in his deposition agreed that it would be difficult to perform a sight check with a blanket was obscuring a body. Doc. no. 118-7, ECF p. 2.

DOJ Findings, MOU, and Additional Reviews

In April 2003, the United States Department of Justice (DOJ) notified Oklahoma County (County) officials of its intention to investigate conditions at the Jail pursuant to the Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C.

---

[3] January 8, 2019 was a Tuesday.

§ 1997.  The DOJ toured the Jail in 2003 and 2007.  In July of 2008, the DOJ issued a findings letter with respect to conditions identified on the April 2007 tour.  In addition to an onsite inspection, the DOJ reviewed policies and procedures, incident reports, medical and mental health records and other materials.  The DOJ concluded that certain conditions at the Jail violated the constitutional rights of detainees.  The agency found, in part, the Jail failed to provide detainees "reasonable protection from harm" and "constitutionally-required mental health care services."  Doc. 119-9, ECF p. 2.

With respect to failure to provide detainees reasonable protection from harm, the DOJ found the Jail was unable to provide adequate security and supervision of detainees due to overcrowding (housing inmates at nearly double its rated capacity), the awkward physical layout of the Jail, and insufficient staffing.  It found that numerous cells were so dark due to detainees covering cell windows and cell lights that it was difficult, if not impossible, for detention staff to be able to provide adequate safety and security checks of detainees.  The DOJ also found that because of overcrowded conditions, the Jail did not have enough cells available to "match the classification level of detainees in a way that met accepted standards of correctional practice."  *Id.* at ECF p. 10.

In addition, the DOJ found that the housing facilities for suicidal detainees did not include the necessary safety features.  As an example, the DOJ pointed out that the cells had ventilation grills and other fixtures that had not been modified to minimize the risk of being used to facilitate a suicide attempt.  It also pointed out that juvenile cells had bunks affixed in a manner that made it possible "to tie a ligature to the structure in order to commit suicide."  *Id*. at ECF p. 12.

As to mental health services, the DOJ found the Jail essentially offered no mental health services to seriously mentally ill detainees.  The DOJ also found that the Jail failed to provide adequate psychiatric services because of a lack of adequate

staff.  It found the Jail had less than half the recommended number of psychiatrists serving detainees.

The remedial measures the DOJ recommended to address the constitutional deficiencies included a recommendation that the Jail ensure there are a sufficient number of adequately trained staff on duty to supervise detainees, implement policies and procedures to allow adequate supervision of detainees, develop and implement an objective classification system consistent with generally accepted correctional standards, have detainees placed and supervised in housing facilities that were appropriate for their classification status, and ensure the timely assessment, identification and treatment of detainees' medical and mental health care needs.

In the findings letter, the DOJ advised that if it was unable to reach a resolution with the County regarding its concerns, the Attorney General may initiate a lawsuit pursuant to the CRIPA.

In October of 2009, the United States and the County executed a Memorandum of Understanding (MOU).  The County did not admit to any violation of federal or state constitutional or statutory law.  However, the County agreed to take certain actions.  Under the MOU, the County agreed to ensure that the Jail was operated and managed by adequate qualified staff and to work on its development of a direct supervision system for the Jail, having at least one officer in each housing unit/pod.  The parties acknowledged that this system could only be implemented with sufficient funding for additional staff, operational resources, and remodeling or replacement of the Jail.  The County agreed to ensure that at least one officer was in each control room and at least one roving officer on the floor to patrol every two housing units or pods.

The County also agreed to make all reasonable efforts to ensure that security staff conducts appropriate rounds with sufficient frequency to provide detainees with adequate supervision and reasonable safety.  Rounds would be conducted at least

every thirty minutes for high security and high risk inmates or detainees, such as those in mental health observation and segregation units. Otherwise, rounds would be conducted at least every 60 minutes or more frequently based on generally accepted correctional standards. The rounds were to include logged, visual inspection of all housing areas.

In addition, the County agreed to maintain an appropriate classification system to protect detainees from unreasonable risk of harm. The system, the County agreed, would include consideration of a detainee's security level, suicide risk, and past behavior.

The County also agreed to maintain sufficient staffing levels or qualified medical staff and mental health professionals to provide adequate care for detainees' serious medical and mental health needs. It agreed to appropriately screen all detainees upon arrival at the Jail to identify individuals with serious medical or mental health conditions. Such screening would be performed by an appropriately qualified mental health professional. It agreed that qualified medical staff would review the initial screening forms daily in order to identify serious medical care needs.

The County agreed to provide medical and mental health assessments for each detainee within 14 days of a detainee's arrival at the Jail. Further, it agreed to ensure that a qualified mental health professional provides timely, adequate, and appropriate screening, assessment, evaluation, treatment, and structured therapeutic activities to detainees requiring mental health services.

In addition, under the MOU, the County agreed to develop and implement policies and procedures pertaining to intake screening to identify newly arrived detainees who may be at risk of suicide. It agreed to develop and implement policies and procedures pertaining to observation of suicidal detainees. It agreed that a detainee who was not actively suicidal, but expressed a suicidal ideation or has a

recent prior history of self-destructive behavior would be placed under "Close Supervision Status" and observed by staff at staggered intervals not to exceed every 15 minutes.

It also agreed to provide safe housing and adequate supervision of suicidal detainees in suicide-resistant cells. This would include replacement or modification of fixtures (i.e. grates, cell bars, or faucets) that could be conducive to hanging.

The MOU was to terminate five years after its effective date, if the parties agreed that the Jail was in substantial compliance with all provisions of the MOU and had maintained substantial compliance with all provisions for 12 months.

In 2011, the DOJ conducted tours of the Jail and a document review to assess the County's efforts to meet the terms of the MOU. The DOJ issued a letter finding in March 2012 that the Jail was not yet in compliance with a number of significant provisions, including those relating to mental health care. It found that the Jail's failure to implement the measures set out in the MOU appeared to be contributing to significant harm, including deaths, at the Jail.

In its letter, the DOJ found there were still long-standing issues related to staffing and the Jail's design and construction. It found these problems negatively impacted the day-to-day operation of the Jail, including the risk of harm to inmates. Specifically, the DOJ found that the construction of the Jail cells, from removable ceiling tiles to the manner in which the bunks were bolted to cell walls, created suicide risks.

As to mental health care, the DOJ found that although a new full-time psychiatrist had been hired, the number of detainees with mental health needs overwhelmed the psychiatrist's ability to address detainees' needs. The DOJ found that the current psychiatric staffing was insufficient and that there was an inadequate number of trained mental health staff at the Jail, including psychiatrists and other therapists. It also found the quality and timeliness of mental health screenings and

timeliness of detainees' access to mental health services was dangerously deficient. It found that two suicides since March 2011 reflected those deficiencies. One of those suicides involved a detainee who screened positive on admission for various mental health issues and suicide risk factors including a history of depression and prior suicide attempts but was not referred for a mental health assessment. The detainee was also placed in protective custody and housed in a single cell. The DOJ advised that single cells are not recommended for depressed or suicidal persons.

The DOJ recommended that mental health assessments should be performed by a qualified licensed mental health professional within 14 days or sooner, if medically necessary, for detainees classified as low risk, 48 hours or sooner, if medically necessary for detainees classified as moderate risk, and immediately, but no later than two hours, for detainees classified as high risk. It also recommended that additional psychiatric and other adequately trained mental staff should be retained so the Jail can provide the psychiatric care required by the MOU and minimize adverse outcomes. Further, it recommended that the County and the Jail should continue to remove and minimize the suicide risks resulting from the construction of the Jail's cells, particularly the removable ceiling tiles and the bunks bolted to cell walls.

In June 2012, the DOJ conducted a tour and document review which focused on the status of the County's efforts to meet the mental health requirements of the MOU. Although the DOJ found significant improvements in the Jail's mental health care services, it found systemic problems with certain key aspects of those services. It had concern about the quality and timeliness of mental health care. It found that there were a number of instances in which detainees' mental health needs were not adequately detected and responded to by staff. It noted that mental health screenings missed detainees who should have been referred to mental health services. It suggested the Jail's mental health administrator flag, track, and conduct monthly

follow-up on detainees with histories of severe suicide attempts, particularly those which occurred while incarcerated. It was concerned about the adequacy of mental health staffing at the Jail, cancellation of group therapy sessions, poor documentation and improperly kept records.

The DOJ further found the Jail's suicide prevention practices were deficient. It found the Jail's physical plant contains many potential suicide hazards, *i.e.* blind spots and the manner in which the beds were bolted to cell walls. The DOJ encouraged and supported an effort to replace or significantly renovate the Jail. In the meantime, it concluded that the Jail must conduct training on how to respond as effectively as possible to the Jail's physical plant obstacles, and on the importance of supervision and communication.

The DOJ asked the Jail to inform it of the measures it intended to take with respect to such items as enhancing the tracking and monitoring of detainees with a history of severe suicide attempts, improving the timeliness of sick calls, and instituting quality assurance processes, including thorough chart reviews.

In June 2013, the DOJ issued findings after conducting another tour of the Jail in February 2013. The tour focused on medical and mental health care. As to medical care, it found that the nursing staff was making clinical decisions that were beyond their scope of practice. It found that nursing staff must be supported by clinicians and must recognize when they are facing situations beyond their expertise.

With respect to mental health care, it found continuing deficiencies with respect to ensuring that inmates are adequately assessed concerning their mental health needs and with respect to development, implementation and revision of treatment plans. The DOJ noted that continuing concerns might have resulted from because of a recent turnover in mental health leadership at the Jail. It found that the quality of mental health assessments and treatment plans was inconsistent, care for inmates with serious health care needs remained problematic, and the number of

mental health staff at the Jail remained a concern.  As to staffing, it noted that the Jail currently had 530 inmates on psychotropic medication, and more than half were not being consistently monitored by mental health staff.  It recommended that the Jail should conduct reviews of records of individuals referred for mental health treatment to determine whether there is a lapse of time between when a referral is made and when an inmate is seen, and whether inmates are seeing a psychiatrist in face-to-face settings on an appropriate schedule.

In addition, the DOJ found that the Jail's physical plant remained unsafe.  It noted that recent suicides attempted, and one which succeeded, used holes in the cells' mattress platforms to secure sheets.  The DOJ noted that it discussed this issue with one County commissioner and other County representatives during and after the February tour.  According to the DOJ, the County responded it that the Jail would take measures to address the holes in mattress platforms and examine the manner in which the mattress platforms were attached to the cell walls.

The DOJ indicated that the MOU would terminate in November of 2014 and that it had contemplated that the County would achieve compliance by November 2013.  It stated that without funding to renovate or replace the existing Jail, the County would be highly unlikely to meet either deadline.  It stated the County would remain at a risk of litigation from the DOJ at least until such time as adequate funding or definitive plans were in place to construct a new Jail or renovate the current facility.

In January 2014, Richard G. Dudley, Jr., a psychiatrist, assessed the Jail's mental health services to determine compliance by the Jail with the MOU.  He sent a letter in May 2014 to the DOJ summarizing his assessment.  He concluded that the County was not in compliance with the MOU because it was not equipped to provide acutely mentally ill inmates (who required inpatient psychiatric care but were not allowed by Oklahoma law to be transferred out of the jail to an acute, forensic

inpatient psychiatry unit) with the level and quality of mental health care they required.  He also expressed concern that inmates in their late teens/early 20s and inmates who were quietly suffering from mental illness were not being identified in screening and assessments of the need for mental health services.

In January 2015, the Oklahoma County Study Committee on the Adult and Juvenile Detention Facilities met in special session.  Matters relating to the MOU, and compliance with it, were discussed by the committee.  Taylor, who was then Oklahoma County Undersheriff and present at the meeting on behalf of Whetsel, discussed with the committee the limitations of staff, space, and funding to operate the Jail to DOJ and CRIPA standards.  He specifically stated that classification issues are a "horrible problem which consequently causes other problems."  Doc. no. 119-18, ECF p. 2.

As agreed by the County in the February 2013 Jail inspection, the County budgeted $185,000.00 to "Repair Jail Beds to comply with DOJ."  Doc. no. 119-14.  A construction agreement in the amount of $184,020.00 was approved in November of 2013.  Doc. no. 119-15.

In February of 2015, John Whetsel (Whetsel), at that time the Oklahoma County Sheriff, sent an email to County commissioners and other officials stating that the bed repair project had never been started and that much had occurred since November of 2013.  He requested that the construction agreement and project be cancelled.  Specifically, Whetsel stated:

> The [Jail] does not have sufficient staff to provide staffing for the construction project and the relocation of inmates would present safety issues beyond our current capabilities due to staffing.  In addition, there are very serious concerns about the necessity for this project and potential unintended negative effects to the ability to clean and drain water from the beds.  At some future time this decision can be reconsidered if necessary.

Doc. no. 119-15.

Former Oklahoma County Sheriff P.D. Taylor (Taylor), who was over the Jail during Gonzalez's detention, testified in deposition that "[n]othing" would have "justified not modifying the mattress platforms to prevent anchor points."  Doc. no. 119-16, ECF p. 5.

In October 2017, then District Attorney David W. Prater sent a letter to the DOJ advising of documents provided to the DOJ to demonstrate that the County had substantially complied with the operational aspects of the MOU.  Mr. Prater also advised that the Board of County Commissioners had voted to decline the request for another site inspection because it was "not convinced it would add anything other than expense without the ability to immediately impact reform efforts."  Doc. no. 119-22, ECF p. 2.

The DOJ responded to Mr. Prater's letter in November 2017 advising that the submissions provided were insufficient to demonstrate substantial compliance that would warrant terminating any of the MOU provisions.  It advised it anticipated an onsite inspection in early part of 2018.  There is no indication in the record whether any inspection or document review occurred in 2018.

Bradley testified in deposition that when Turn Key took over and contracted with OU's Department of Psychiatry, the Jail's entire mental health system was changed.  He testified that when the DOJ came to the Jail in 2019, it commented: "that that was one of the best mental health programs they had seen[.]"  Doc. no. 134-2, ECF p. 3, ll. 22-24.  However, Bradley also testified that the comment was not put in writing.  *Id*., ECF p. 4, ll. 1-8.

Although the operation of the Jail no longer lies with the Oklahoma County Sheriff, the requirement to maintain compliance with the MOU and to improve conditions at the Jail remains in place.

The Oklahoma County Sheriff's Office issued reports of Serious Incident Review meetings in January and May of 2013, in February of 2014, in December 2015, in August and November of 2016 and May of 2017, which indicated that there were three attempted suicides and six suicides in the Jail by hanging. A report of the Serious Incident Review meeting in July 2013 indicated a suicide with unidentified means. The report noted improper sight checks. In the report of the Serious Incident Review meeting in May 2017, it indicated an inmate death under investigation and that sight checks were not complete. The report of the Serious Incident Review meeting for October 2018 indicated an inmate death due to alcohol poisoning and a lack of consistency with sight checks.

The report of the Serious Incident Review meeting in July 2019, indicated that Gonzalez's death was a suicide by hanging and "sight checks not within policy guidelines." Doc. no. 119-17, ECF p. 27.

### III. Analysis

Deliberate Indifference to Serious Medical Needs

"A prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment." Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir. 2000). The deliberate indifference standard applies to pretrial detainees, like Gonzalez, through the Fourteenth Amendment's Due Process Clause. See, Burke v. Regalado, 935 F.3d 960, 991 (10th Cir. 2019). Claims based on a jail suicide are assessed under the deliberate indifference standard. See, Estate of Burgaz by and through Zommer v. Board of County Commissioners for Jefferson County Colorado, 30 F.4th 1181, 1186 (10th Cir. 2022).

The deliberate indifference standard involves both an objective and subjective component. Sealock, 218 F.3d at 1209 (quotations omitted). "The objective component is met if the deprivation is 'sufficiently serious.'" Id. (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). Despite defendants' arguments suggesting

28

otherwise, "[d]eath by suicide satisfies that requirement" under Tenth Circuit precedent. *See*, Estate of Burgaz, 30 F.4th at 1186; *see also*, Cox v. Glanz, 800 F.3d 1231, 1240 n. 3 (10th Cir. 2015).

The subjective component is satisfied if the prison official "knows of" and "disregards" an excessive risk to an individual inmate's health or safety. Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005) (quoting Farmer, 511 U.S. at 837). "The official must be aware of the facts from which the inference of substantial risk of serious harm could be drawn and also draw that inference." Lucas v. Turn Key Health Clinics, LLC, 58 F.4th 1127, 1137 (10th Cir. 2023). In the context of a pretrial detainee-suicide case, the subjective component requires the prison official to have "subjective knowledge that [the individual pretrial detainee] is a substantial suicide risk." Crane v. Utah Department of Corrections, 15 F.4th 1296, 1307 (10th Cir. 2021). A factfinder is allowed to infer that a prison official knew of the substantial suicide risk based solely on circumstantial evidence. *See*, Estate of Burgaz, 30 F.4th at 1186. And a factfinder is also allowed to infer that a prison official knew of a substantial suicide risk from the very fact that the risk was obvious. *Id*. ("If a risk is obvious, so that a reasonable man would realize it, we might infer that the deputies did in fact realize it.") (alterations omitted). Further, the factfinder may find that a prison official disregards the substantial suicide risk when he fails to take reasonable measures to abate the risk. Lucas, 58 F.4th at 1137; Crane, 15 F.4th at 1307.

Turn Key

Turn Key's § 1983 liability, like that of a municipality or other governmental entity, is limited by Monell v. Department of Social Services of New York, 436 U.S. 658 (1978). *See*, Dubbs v. Head Start, Inc., 336 F.3d 1194, 1216 (10th Cir. 2003) (case law from this and other circuits has extended the Monell doctrine to private § 1983 defendants); *see also*, Estate of Beauford, 35 F.4th at 1275 n. 19 (declining to revisit Dubbs absent *en banc* consideration or an intervening Supreme Court

decision); *see also*, Lucas, 58 F.4th at 1144 (applying Monell liability with respect to Turn Key).

Generally, to establish Turn Key's liability under Monell, plaintiff must demonstrate that one of Turn Key's employees committed a constitutional violation, *i.e.*, was deliberately indifferent to Gonzalez's serious medical needs. *See*, Estate of Beauford, 35 F.4th at 1275; *see also*, Strain v. Regalado, 977 F.3d 984, 997 (10th Cir. 2020) ("We typically will not hold a municipality liable for constitutional violations when there was no underlying constitutional violation by any of its officers.") (internal quotations marks and citation omitted). Nevertheless, for Monell liability to attach, plaintiff must establish facts showing (1) an official policy or custom, (2) causation, and (3) deliberate indifference. Lucas, 58 F.4th at 1145.

In her response, plaintiff does not specifically identify any Turn Key employee or personnel whom she contends violated Gonzalez's constitutional rights. However, with her briefing, she suggests that Cargill, Morris, Chesser, Zoski, and Dr. Cuka[4] were deliberately indifferent to Gonzalez's serious medical needs.

As to Cargill, plaintiff suggests that she failed to appropriately classify and assign Gonzalez to Mental Health Observation status. According to plaintiff, Turn Key's "records contain numerous incidents and support that Ms. Gonzalez required mental health observation." Doc. no. 118, ECF p. 18. Plaintiff points to Gonzalez's previous suicide attempts and an order for inpatient mental treatment by an Oklahoma County court.

However, plaintiff has failed to proffer any evidence that Cargill was aware of Gonzalez's previous suicide attempts or an order for inpatient mental treatment

---

[4] The relationship between Turn Key and OU's Department of Psychiatry or the OU Health Sciences Center is not clear from the record. According to Bradley, Turn Key contracted with OU's Department of Psychiatry. The court assumes, for summary judgment purposes only, that Turn Key had control over, and responsibility of, OU's Department of Psychiatry personnel.

by the Oklahoma County court at the time she conducted the mental health intake screening for Gonzalez.  Although such information may have been accessible through the electronic records, plaintiff has proffered no evidence that Cargill reviewed any records before or during her assessment.  In the mental health intake screening conducted by Cargill,[5] Gonzalez denied being on any current medications for depression, psychosis, or for other mental conditions.  Doc. no. 109-2, ECF p. 2.  She also denied attempting to harm herself in the last year.  *Id.*  Although Gonzalez responded affirmatively that she had seen a mental health professional for emotional or mental health, she reported it had not been within the last seven years.  *Id.*  Cargill also observed no signs or conditions of recent suicide attempts or self-harm by Gonzalez.  *Id.*  Based on Cargill's mental health intake screening, Cargill's stated disposition/plan of action for Gonzalez was "No MH Symptoms – General Population."  *Id.*, ECF p. 3.

Plaintiff also relies on the "MHO" notation on the pre-screening booking form which Cargill signed before Gonzalez was assigned to General Population and the 6 David pod.  Plaintiff contends that the "MHO" notation was consistent with previous pre-screening booking forms which designated Gonzalez as "MHO."  The court notes that the record does not clarify whether Cargill, as opposed to the unidentified prescreen staff member who originally signed the form,[6] wrote the "MHO" notation. The record reflects that after her arrival at the Jail, Gonzalez was uncooperative and combative.  Several hours later, however, Gonzalez was able to answer questions

---

[5] Plaintiff, in her response, denies that Cargill performed a mental health intake screening because the pre-screening booking form, doc. no. 118-1, ECF p. 7, was not filled out completely by Cargill. However, Turn Key's electronic records clearly show that Cargill conducted a mental health intake screening of Gonzalez.  Cargill signed the incomplete pre-screening booking form after conducting the mental health intake screening.

[6] The unidentified staff member signed the form at "3[:]02."  Cargill signed it at "06[:]46."  Doc. no. 109-2, ECF p. 48.

coherently, and Cargill conducted the intake mental health screening. During that process, Cargill, through her questioning, did not identify any risk factors for self-destructive behavior and recommended General Population.

Nevertheless, even if Cargill made the "MHO" notation or was aware that it had been made when she signed the pre-screening booking form, the court concludes that the "MHO" notation, in and of itself, is not sufficient evidence for a reasonable jury to infer that Cargill was subjectively aware that Gonzalez was a substantial suicide risk.

The court additionally concludes that the record evidence is insufficient for a reasonable jury to infer that the risk of suicide was obvious, or for a reasonable jury to infer that Cargill had actual knowledge. In her briefing, plaintiff asserts that "[i]nmates with mental illness must be housed within mental health observation." Doc. no. 118, ECF p. 136. Plaintiff relies upon the policy of the Oklahoma County Sheriff, *see*, doc. no. 118, ECF p. 11, ¶ 1 (citing doc. no. 118-2), and the deposition of Timothy Gravette, *see*, doc. no. 136, ECF p. 2 (citing Mr. Gravette's deposition testimony), to support her assertion. The court concludes that the Sheriff's cited policy, as written, does not require that all inmates with a mental illness be housed within mental health observation. Doc. no. 118-2, ECF p. 7 ("Sight checks will be conducted at irregular and varying times . . . depending on the unit designation" and "Staff will conduct thirty (30) minute sight checks on all inmates *assigned* to mental health status.") (emphasis added). And the court has ruled that Mr. Gravette cannot provide expert testimony on issues which involve medical judgment. *See*, doc. no. 137.

Moreover, Turn Key has presented expert opinion that "neither a history of previous psychiatric hospitalizations, a history of previous suicide attempts, or a history of having been in a Mental Health Court would in themselves be reasons to remain housed in a mental health unit throughout one's jail stay." Doc. no. 109-11,

ECF p. 12.  And according to that expert opinion, "having diagnoses of depression, PTSD, and/or substance abuse would not in themselves constitute reasons for being housed on a mental health unit."  *Id*.  Instead, "the determination to be housed on such a unit is based on an inmate's current mental health needs along with an individualized assessment of their current level of risk to themselves and others." *Id*., ECF p. 13.  Plaintiff has not proffered any expert evidence to rebut Turn Key's proffered expert opinion.[7]  Also, Bradley testified that the criteria for determining Mental Health Observation status were for OU's Department of Psychiatry to determine.  The record reflects that both Dr. Strohl and Dr. Cuka were aware that Gonzalez was housed in General Population, and both concluded, after their initial evaluations, that she could remain in that setting.  Further, while plaintiff has presented evidence which shows "MHO" notations on other pre-screening booking forms for Gonzalez, the factual record does not demonstrate that the "MHO" notation resulted in Gonzalez being housed with Mental Health Observation status, rather than General Population status.

Plaintiff also suggests Morris, Chesser, and Dr. Cuka were deliberately indifferent to Gonzalez's serious medical needs because she was never seen by a psychiatrist after she requested a change in her anxiety medications.  The factual record reflects that Gonzalez's undated request was referred to mental health by Morris on December 29, 2018.  Doc. no. 109-2, ECF p. 46; Doc. no. 111-3, ECF p. 50.  The request stated, "Can I change my anxiety meds Please[,]" with a smiley face drawn underneath it.  Doc. no. 109-2, ECF p. 46.   Pursuant to that referral, an appointment was scheduled for January 1, 2019, which was rescheduled by Rice, a licensed professional counselor.  Doc. no. 111-3, ECF p. 50.  Chesser, another licensed professional counselor, conducted an evaluation or triage with Gonzalez on

---

[7] As stated, Mr. Gravette cannot proffer expert testimony on issues involving medical judgment.

January 2, 2019.   During that evaluation, Gonzalez reported that she thought Lexapro was making her stomach hurt and she wanted to change to something else. Doc. no. 109-2, ECF p. 25.  The record reflects that Chesser reported what Gonzalez told her and then referred the matter to a psychiatrist.  *Id*., and doc. no. 111-3, ECF p. 50.  Dr. Cuka was scheduled to evaluate Gonzalez, but he rescheduled the appointment twice due to a scheduling conflict on January 4, 2019 and January 8, 2019.  Gonzalez committed suicide on January 8, 2019.  *Id*.

The record evidence, even when viewed in a light most favorable to plaintiff, is not sufficient to raise a genuine issue for trial as to whether Morris, Chesser or Dr. Cuka were subjectively aware that Gonzalez presented a substantial suicide risk. Although they knew Gonzalez wanted to change her anxiety medications, there is no evidence to indicate they knew she presented a suicide risk.  Gonzalez's request contained a smiley face when received and referred to mental health by Morris, and Gonzalez reported to Chesser that she wanted to change her Lexapro medication because it was making her stomach hurt.  Chesser indicated in her notes of the evaluation that Gonzalez was observed as "alert and cooperative," "stable," and "no overt signs of mental health concern."  Doc. no. 109-2, ECF p. 25.  Gonzalez was also compliant with her medications.  *Id*.  Nothing in Chesser's evaluation indicated a suicide risk based on Gonzalez's request.  And Chesser's referral to Dr. Cuka did not provide any facts to reasonably support an inference that Gonzalez presented a suicide risk.  Further, while Gonzalez had specifically made a request on December 11, 2018 to discontinue Buspar and add Zyprexa, Dr. Cuka conducted a medication follow-up with Gonzalez on December 24, 2018, noting "no report of problems with effectiveness or adverse side effects or new problems."  Doc. no. 111-3, ECF p. 50.

Although plaintiff proffers evidence of a sick call request form by Gonzalez requesting "MENTAL HEALTH URGENT" and stating, "I feel like I am going to have a breakdown and having thoughts I don't normally have," *see*, doc. no. 118-2,

ECF p. 3, it is undisputed the form was not provided, and the request was not communicated, to any Turn Key employee. Gonzalez's cellmate told Jail investigators that Gonzalez had not reported her thoughts.

After careful consideration, the court has concluded that the evidence in the record, viewed in plaintiff's favor, is inadequate to enable a reasonable jury to conclude that the risk of Gonzalez taking her life was obvious. In her response, plaintiff relies upon the deposition testimony of Dr. Strohl that if someone had had eight prior suicide attempts (as Gonzalez had reported to Woods in October of 2018) and was requesting to change medications, it would be important to follow up on a request to change her medications and to evaluate her for suicide watch. Plaintiff also relies on DOJ findings that clinicians such as psychiatrists should make clinical decisions. However, this evidence, in the court's view, is insufficient to raise a genuine issue of material fact as to whether a substantial suicide risk was obvious, given the request as written by Gonzalez and as reported to Chesser, so that subjective knowledge of a substantial suicide risk could be inferred as to Morris and Chesser. Further, the court concludes that the factual record before the court is insufficient to enable a reasonable jury to conclude that a substantial suicide risk was known by or obvious to Dr. Cuka based on the request as written and referred to him.

Plaintiff further suggests that Zoski was deliberately indifferent to Gonzalez's serious medical needs because no mental health assessment was conducted after Gonzalez's physical altercation with her cellmate. Plaintiff asserts that Zoski, by her own deposition testimony, had not received training (when she received her licensed practical nurse degree) qualifying her to conduct such an assessment. She suggests that Zoski should have referred Gonzalez to a clinician. The court, however, concludes that the record before the court is insufficient to raise a genuine issue of material fact as to whether it was known or obvious that Gonzalez presented

a substantial risk of suicide at the time she was seen by Zoski. The factual record contains no statements made or behavior exhibited by Gonzalez to Zoski to enable a reasonable jury to infer that she was at substantial risk for taking her life.

In sum, the court concludes that plaintiff has failed to proffer sufficient evidence to raise a genuine issue of material fact that Turn Key's employees or personnel were deliberately indifferent to Gonzalez's serious medical needs.[8]

However, even if the court were to conclude that at least one of the Turn Key employees was deliberately indifferent to Gonzalez's serious medical needs, the court concludes that plaintiff has failed to proffer sufficient evidence for a reasonable jury to find Turn Key liable under <u>Monell</u>. Plaintiff fails to proffer evidence to raise a genuine issue of material fact as to an official policy, causation, or deliberate indifference.

Under Tenth Circuit precedent, any of the following constitute an official policy:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results

---

[8] The court notes the factual record indicates that other Turn Key employees or personnel had contact with Gonzalez regarding her mental health, including Loudermilk, Woods, Valencia, Hanes, and Dr. Strohl. To the extent that plaintiff claims that any of these employees or personnel were deliberately indifferent to Gonzalez's serious medical needs, the court finds that the factual record fails to raise a genuine issue for trial as to any such claim with respect to these individuals.

> from deliberate indifference to the injuries that may be caused.

Lucas, 58 F.4th at 1145 (quoting Crowson v. Washington County, 983 F.3d 1166, 1184 (10th Cir. 2020)) (other quotation omitted).

Plaintiff suggests that Turn Key had an official policy of placing pretrial detainees who qualified for Mental Health Observation status in General Population status or of failing to appropriately communicate pretrial detainees' Mental Health Observation status to the Jail's classification unit. However, the record contains no factual evidence of any formally promulgated policy to that effect. In addition, there is also insufficient factual evidence of any well-settled custom or practice by Turn Key employees or personnel to that effect. The record contains only the one incident involving Gonzalez. Additionally, there is no record evidence that Cargill was an employee with final policymaking authority or that a final policymaker ratified Cargill's action or inaction. And plaintiff has not alleged or presented evidence of deliberately indifferent training or supervision of Cargill by Turn Key.

But even if the record contained evidence of the existence of an official policy by Turn Key as plaintiff suggests, the court concludes that plaintiff has failed to proffer sufficient evidence that the official policy was causally connected to the alleged constitutional violation. "To establish the causation element, the challenged policy or practice must be closely related to the violation of the plaintiff's federally protected right." Schneider, 717 F.3d at 770 (internal quotation marks and citation omitted). There must be a "direct causal link between the municipal action and the deprivation of federal rights." Id. (quotation marks and citation omitted). The evidence before the court indicates that pretrial detainees, although assessed and classified at intake screening, could be reclassified in the event of a change of circumstances. After Gonzalez was placed in General Population housing upon initial screening by Cargill, she was seen and evaluated by psychiatrists, Dr. Strohl

and Dr. Cuka, both of whom prescribed her medication for her mental issues, and both of whom were aware of Gonzalez being in the General Population, but both of whom found she was able to function satisfactorily in that setting.  Dr. Strohl, after his initial evaluation of Gonzalez, created an alert that Gonzalez was a mental health patient.  Nevertheless, he determined that Gonzalez could remain in her current General Population setting.  In the court's view, plaintiff has failed to proffer sufficient evidence to demonstrate that Turn Key's action or inaction, via Cargill, regarding classification at intake screening was the "moving force" behind the injury alleged.  Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir. 1998) (quotation marks and citation omitted).  Plaintiff has not proffered evidence sufficient to enable a reasonable jury to find a direct causal link between Turn Key's action or inaction, via Cargill, and the alleged deprivation of Gonzalez's federal rights.

Lastly, the court finds that plaintiff has failed to establish sufficient facts for a reasonable jury to find that the asserted official policy with respect to classification was established with deliberate indifference as to its known or obvious consequences.  Under Tenth Circuit precedent,

> [t]he deliberate indifference standard may be satisfied when the [private entity] has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm.  In most instances, notice can be established by providing the existence of a pattern of tortious conduct.  In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction[.]

Schneider, 717 F.3d at 771 (quoting Barney, 143 F.3d at 1307).

Plaintiff has not proffered any evidence of a pattern of tortious conduct by Cargill or any other Turn Key employee or personnel with respect to classification of pretrial detainees. While plaintiff has proffered evidence of the DOJ findings with respect to intake screening of mental health detainees and classification issues, there is no evidence that any of those findings related to Turn Key or that Turn Key had any knowledge of those DOJ findings. Further, plaintiff has not demonstrated that Gonzalez's suicide was a highly predictable or plainly obvious consequence of Turn Key's action or inaction.

In her papers, plaintiff suggests that in addition to failing to provide appropriate classification, Turn Key had "a policy and procedure of having unqualified social workers perform evaluations when detainees made requests for changes to their mental health medications." Doc. no. 118, ECF p. 19. She contends that in the days leading up to Gonzalez's death, she was "making cries for help to medical staff." *Id*. Plaintiff points out that Gonzalez had made a request to change her anxiety medications but was never evaluated by a psychiatrist. According to plaintiff, this result fell in line with Turn Key's policy, as revealed by corporate testimony, that appointments are not made until seven to fourteen days after a request is made. Plaintiff also points out that Dr. Strohl testified in deposition that he would want to have an evaluation of an individual requesting to change her medication the same or next day and that he did not see any referral to a psychiatrist. Further, plaintiff points to DOJ findings that clinical decisions should be made by clinicians like psychiatrists.

The court concludes that plaintiff has not presented evidence sufficient to raise a genuine issue of material fact that licensed professional counselors, like Chesser, were not qualified to triage a pretrial detainee, like Gonzalez, when she requested a change in her anxiety medications. However, even if the record evidence, viewed in plaintiff's favor, would raise a genuine issue of material fact that licensed

professional counselors were unqualified to evaluate a pretrial detainee, like Gonzalez, and even if the record evidence, viewed in plaintiff's favor, would establish that Turn Key had an official policy of allowing licensed professional counselors to evaluate pretrial detainees, the court concludes that plaintiff has not proffered evidence sufficient to raise a genuine issue of material fact establishing that the policy is causally connected to the alleged constitutional violation.

The record reflects that Chesser saw Gonzalez on January 2, 2019, after Morris referred Gonzalez's sick call request to mental health on December 29, 2018. Gonzalez reported to Chesser that she "thinks the Lexapro is making her stomach hurt" and she "wants to change to something else." Doc. no. 111-3, ECF pp. 50, 67. Gonzalez did not indicate or suggest any other reason for needing a change of her medication. There is nothing in the record which would raise a genuine issue of material fact that based on the statements made by Gonzalez to Chesser, she presented a substantial risk of suicide. Although Dr. Strohl testified in deposition that he would want to have an evaluation of an individual requesting to change medication the same day or the next day, the court notes that Dr. Strohl's testimony did not actually relate to Gonzalez specifically or the medication that she was prescribed at the time of her request. *See*, doc. no. 118-6, ECF pp. 17-18. And while Dr. Strohl also testified that he did not see anything in the records to show a referral to a psychiatrist, the factual record before the court reveals that Chesser made a referral to a psychiatrist after she saw Gonzalez. And she did not make the appointment for a psychiatrist seven to fourteen days out. The record shows that Dr. Cuka had scheduling conflict with the appointment for January 4, 2019, two days after Chesser saw and referred Gonzalez to a psychiatrist. Doc. no. 111-3, ECF p. 50. And he also had a scheduling conflict with the appointment on January 8, 2019, which was six days after Gonzalez was seen by Chesser. *Id*. The record does not support an inference that Gonzalez was not seen by a psychiatrist because of any

Turn Key policy to set appointments for mental health needs seven to fourteen days out. Further, the record does not contain evidence sufficient to enable a reasonable jury to find that Turn Key's alleged policy regarding licensed professional counselors was the moving force behind Gonzalez's suicide.

Lastly, the court concludes that plaintiff has not proffered sufficient evidence to raise a genuine issue of material fact as to deliberate indifference. Plaintiff has not proffered any evidence of a pattern of tortious conduct by Chesser or any other Turn Key licensed professional counselor. Further, plaintiff has not demonstrated that Gonzalez's suicide was a highly predictable or plainly obvious consequence of Turn Key's action or inaction, via Chesser or any other Turn Key licensed professional counselor.

Because plaintiff has failed to proffer sufficient evidence, viewed in her favor, for a reasonable jury to find Turn Key liable under Monell, the court concludes that Turn Key is entitled to summary judgment on plaintiff's § 1983 claim against it.

Oklahoma County Sheriff

Tommie Johnson (Johnson), the current Oklahoma County Sheriff, has been named as defendant in his official capacity. Plaintiff's lawsuit against Johnson in his official capacity is equivalent to a lawsuit against Oklahoma County. *See*, Cox, 800 F.3d at 1254. Thus, Monell applies, and plaintiff must show (1) an official policy or custom, (2) causation, and (3) deliberate indifference. *See*, Schneider, 717 F.3d at 769-770.

Generally, a governmental entity, like Oklahoma County, may not be held liable under Monell when there was no underlying constitutional violation by any of its officers. Strain, 977 F.3d at 997. In limited circumstances, however, a viable Monell claim may exist without individual liability. *See*, Crowson, 983 F.3d at 1191; *see also*, Quintana v. Santa Fe County Board of Commissioners, 973 F.3d 1022, 1033-34 (10th Cir. 2020). "'Deliberate indifference to serious medical needs

may be shown by proving there are such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care.'" *Id*. at 1186 (quoting <u>Garcia v. Salt Lake County</u>, 768 F.2d 303, 308 (10th Cir. 1985)). And "even where 'the acts or omissions of no one employee may violate an individual constitutional rights, the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights.' " *Id*.

In her response, plaintiff does not identify any of Johnson's employees whom she contends violated Gonzalez's constitutional rights. Plaintiff suggests that Bell and Adams, who were employed as detention officers, were deliberately indifferent to Gonzalez's serious medical needs. However, plaintiff has proffered insufficient evidence to raise a genuine issue of material fact as to whether Bell and Adams were deliberately indifferent to Gonzalez's substantial risk of suicide. Plaintiff has not presented evidence sufficient to enable a reasonable jury to infer that Bell and Adams were subjectively aware of Gonzalez's substantial suicide risk.

There is no evidence that Bell was aware of Gonzalez's mental health issues, her previous suicide attempts, or an order by the Oklahoma County court for inpatient mental health treatment. While Bell would have been aware, when conducting her sight check at 3:18 p.m., that Gonzalez had placed a blanket over the top bunk, the court concludes that such knowledge is not sufficient, in and of itself, to enable a reasonable jury to conclude that that it was known or obvious to Bell that Gonzalez intended to commit suicide. And even if a reasonable jury could find Bell's testimony that she saw Gonzalez during the sight check to be unworthy of belief (in light of the Jail investigators' report and testimony and the amount of time Bell took to conduct the sight check), the court concludes that Bell's inability to have seen Gonzalez, alone, is not sufficient for a reasonable jury to find that it was known or obvious to Bell that Gonzalez intended to commit suicide. Further, the fact that

Bell may have violated the Jail's internal procedures by not having Gonzalez remove the blanket to ensure complete visibility of the cell during the sight check is not sufficient to establish deliberate indifference.  *See*, Heidel v. Mazzola, 851 Fed. Appx. 837, 840-41 (10th Cir. 2021) ("[A]n officer's failure to follow internal jail policies does not automatically mean he or she acted with deliberate indifference.").

As to Adams, there is no evidence that she was aware of Gonzalez's mental health issues, her previous suicide attempts, an order by the Oklahoma County court for inpatient mental health treatment.  Although Adams witnessed the physical altercation between Gonzalez and her cellmate and knew that it occurred because Gonzalez "just needed a break," the court concludes that reasonable jury could not find, based on that behavior and statement, that Adams was subjectively aware that Gonzalez presented a substantial suicide risk.

Plaintiff cites the DOJ findings that single cells are not recommended for depressed or suicidal individuals and that the Jail's cell bunk beds had to be modified to eliminate anchor points.  In addition, she cites reports of Serious Incident Review meetings describing multiple incidents of hangings in the Jail from 2013 to 2017.  However, there is no evidence that Adams knew of the DOJ findings or the reports of Serious Incident Review meetings.  Also, there is no evidence that Adams knew that Gonzalez had any mental health issues at the time she placed her in the cell by herself.  Although at the time Adams found Gonzalez, she was escorting a nurse to pass out medications, there is no evidence that Adams knew, prior to that time, that Gonzalez had been prescribed medication for mental health issues.

In sum, the court concludes that plaintiff has failed to proffer sufficient evidence to raise a genuine issue of material fact that the detention officers at the Jail were deliberately indifferent to Gonzalez's serious medical needs.

While the parties do not specifically address whether Johnson's Monell liability may be premised on the actions or inactions of Turn Key's employees or

personnel, the court assumes, for purposes of summary judgment, that it can. *See*, Burke, 935 F.3d at 994.  However, as previously discussed, the court concludes that plaintiff has failed to proffer sufficient evidence to raise a genuine issue of material fact as to whether any of Turn Key's employees or personnel were deliberately indifferent to Gonzalez's serious medical needs.

The court recognizes, as previously stated, that Monell does not require a determination of individual liability to find a governmental entity liable.  "[E]ven where 'the acts or omissions of no one employee may violate an individual's constitutional rights, the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights.'"  Crowson, 983 F.3d at 1186 (quoting Garcia, 768 F.3d at 310).  "Deliberate indifference to serious medical needs may be shown by proving there are such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care."  *Id*. at 308.  Under Tenth Circuit precedent, this is a "systemic failure" claim.  *Id*. at 1193.

Plaintiff has argued that staffing (not receiving timely mental health services from a psychiatrist), procedures (engaging in improper sight checks) and facilities (having bunk beds bolted to cell walls in such a manner as to create suicide risks) effectively denied Gonzalez access to adequate medical care.  Viewing the record evidence in a light most favorable to plaintiff, the court concludes that plaintiff has proffered sufficient evidence to raise a genuine issue of material fact as to the existence of a custom, *i.e.* widespread practice, of Oklahoma County, with respect to the complained-of staffing, procedures, and facilities.  Plaintiff has proffered sufficient evidence, viewed in plaintiff's favor, to raise a genuine issue of material fact as to whether Oklahoma County had "actual or constructive notice that its action[s] or failure[s] to act [were] substantially certain to result in a constitutional violation, and it consciously or deliberately [chose] to disregard the risk of harm."

<u>Barney</u>, 143 F.3d at 1307.  This evidence includes, but is not limited to, the DOJ findings with respect to timeliness of access to mental health services, improper safety and security checks, and the manner in which bunk beds were attached to cell walls so as to facilitate suicide attempts; reports of Serious Incident Review meetings describing numerous suicide attempts and suicides by hanging and deaths involving improper sight checks; Oklahoma County's budget and contract for repair of bunk beds, Sheriff Whetsel's 2015 email requesting Oklahoma County Commissioners to cancel the contract; and Taylor's testimony regarding the lack of justification for failing to modify the bunk beds.  Further, plaintiff has proffered sufficient evidence, viewed in plaintiff's favor, to raise a genuine issue of material fact as to whether the County's customs regarding staffing, procedures, and facilities were the moving force behind or caused the deprivation of Gonzalez's constitutional rights.  As a result, the court finds that genuine issues of material fact exist as to the liability of the County under <u>Monell</u>.  Accordingly, motion of the Sheriff, in his official capacity, will be denied.

Conclusion

Based on the foregoing, Defendant Turn Key Health Clinics, LLC's Motion for Summary Judgment (doc. no. 109) is **GRANTED** and the Motion for Summary Judgment by Defendant Sheriff Tommie Johnson, III, in his official capacity (doc. no. 111) is **DENIED**.   The 42 U.S.C. § 1983 claim against defendant Sheriff Tommie Johnson, III, in his official capacity, will proceed to trial.

DATED this 7th day of November, 2024.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

21-0011p040.docx